**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALMUS WILSON, MARILYN WILSON,** | : | |
| **CHARMAINE COOPER, MARCO YAGUAL,** | : | |
| **MARIA YAGUAL, NATALIE WILSON, and** | : | |
| **RAYON MCLEAN,** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **3:CV-04-1737** |
| | : | **(JUDGE VANASKIE)** |
| **STEVE PARISI, et al.,** | : | |
| **Defendants** | : | |

**<ins>MEMORANDUM</ins>**

_____This is one of several actions brought by purchasers of property in the Pocono Mountain

region of Pennsylvania.  The plaintiffs in these lawsuits claim they were the victims of a

predatory lending scheme aimed at low income, unsophisticated home buyers lured into

Pennsylvania by misleading advertisements.  The plaintiffs assert claims under the Racketeer

Influenced and Corrupt Organizations Act ("RICO" or "Racketeering Act"), 18 U.S.C. §§ 1961-

1968, and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

("UTPCPL"), 73 P.S. §§ 201-1 to -9.3.  These actions are brought against three categories of

defendants: (1) the developers who sold the properties and arranged for financing;[1] (2) the

_____

[1]Other actions sharing common developer defendants with this case include <ins>Hearns v. Parisi, et al.</ins>, docketed to 3:CV-05-0323; <ins>Jeppson v. Parisi, et al.</ins>, docketed to 3:CV-05-0564 (summary judgment in favor of Defendants entered by Memorandum and Order entered on Oct. 4, 2007, Dkt. Entry 97); <ins>Alvarez et al. v. Parisi, et al.</ins>, docketed to 3:CV-05-00624 (dismissed for failure to prosecute by Order dated June 18, 2007, Dkt. Entry 58); <ins>Vicuna v. Parisi, et al.</ins>, docketed to 3:CV-05-1515; and <ins>Gaines v. Parisi, et al.</ins>, docketed to 3:CV-06-00074.

parties who appraised the properties; and (3) the lending institutions that provided the financing.[2]

In this action, all three (3) categories of defendants move for summary judgment against all seven (7) plaintiffs. Defendants' motions will be granted as to all Plaintiffs with the exception of Almus and Marilyn Wilson. As to the Wilsons' claims, the Lender Defendants' motions will be granted, but the Developer and Appraiser Defendants' motions will be granted only in part. Finally, the Lender Defendant's motion for summary judgment on its counterclaim against Plaintiff Natalie Wilson will be granted.

## I. PROCEDURAL HISTORY

On August 6, 2004, seven (7) individuals, claiming to be victims of an alleged predatory lending scheme, filed this action against twenty-seven (27) defendants. (Dkt. Entry 1.)  The Plaintiffs, Almus and Marilyn Wilson, Charmaine Cooper, Marco and Maria Yagual, and Rayon McLean and Natalie Wilson, purchased four (4) different properties in the Pocono Mountain Region of Pennsylvania. The three groups of Defendants in this case are as follows: (1) the PK Defendants – the developers who sold the properties and arranged for their financing;[3] (2)

_____

[2]This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, 12 U.S.C. § 2614, and 18 U.S.C. § 1964(c), and jurisdiction over the UTPCPL claims pursuant to 28 U.S.C. § 1367(a).

[3]The PK Defendants include Steve Parisi, Donald Kishbaugh, P & K Developers, LLC; Eagle Valley Homes, Inc.; Eagle Valley Homes North Incorporated; Mobile Developing Company; Nations First Mortgage Company; Eagle Mountain Mortgage Company; Kishbaugh and Parisi d/b/a P & K Developers, Inc.; Nations 1st Mortgage Co., LLC; Nations 1st Mortgage

Lisa Marie's Appraisal Service, Inc. and Lisa Marie Gibson (sometimes referred to collectively as "Lisa Gibson"), and Jenny Centrella – the parties who appraised three of the four properties at issue in this case; and (3) Bankers First Mortgage Inc. and Bankers 1st Mortgage Co., ("Bankers First"), New Century Mortgage Corporation ("New Century"), Ocwen Federal Bank ("Ocwen"), Firstar Bank, N.A. ("Firstar"), Keystone Financial Mortgage ("Keystone"), Bank of America Mortgage ("Bank of America"), Irwin Mortgage Corporation d/b/a IFC Mortgage Corp. and Irwin Mortgage Corporation ("collectively known as the "IMC Defendants"), IndyMac Bank ("IndyMac"), Bank One, N.A. ("Bank One"), and West Coast Realty Services, Inc. ("West Coast") – the lending institutions.  In response to Plaintiffs' complaint, the majority of Defendants filed Motions to Dismiss.[4]

On February 7, 2006, this Court granted in part and denied in part Defendants' Motions to Dismiss.  (Dkt. Entry 104.)  Specifically, this Court declined to dismiss the first three counts of the Complaint, which asserted RICO claims.  Lisa Gibson's Motion to Dismiss was denied for failure to file a supporting memorandum of law.  As to the claims under the UTPCPL (Counts Five, Six, Seven and Twelve), the Court denied the PK Defendants' Motion to Dismiss,[5] but granted the Lender Defendants' Motion to Dismiss Counts Five and Six and dismissed

---

Company, Incorporated; and Nations 1st Mortgage Brokers Corporation.

[4]Defendant Jenny Centrella filed an answer to the Complaint.  (Dkt. Entry 16.)

[5]Counts Seven (7) and Twelve (12) implicated only the PK Defendants.

Plaintiffs' claims under the UTPCPL against the Lender Defendants without prejudice.  The

Court granted Defendant Bank One's Motion to Dismiss under the Home Ownership and Equity

Protection Act ("HOEPA"), 15 U.S.C. §§ 1639, et seq.[6]  Plaintiffs' claims under the Real Estate

Settlement and Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, et seq. (Counts Nine and Ten),

were dismissed without prejudice, affording Plaintiffs leave to amend.[7]  Finally, the Court

dismissed with prejudice Plaintiffs' claim of negligent misrepresentations against all

Defendants.[8]

On June 15 and 16, 2006, Bank One and Indymac filed Motions for Judgment on the

Pleadings. (Dkt. Entries 147, 148.)  The Court granted both Motions and dismissed Bank One

and IndyMac.  (Dkt. Entry 221.)  In addition to Motions for Judgment on the Pleadings, the

following activity occurred after the Court resolved Defendants' Motions to Dismiss:  Defendant

West Coast was dismissed for Plaintiffs' failure to effectuate service of process (Dkt. Entry

136); Defendant Bankers First was dismissed because Plaintiffs did not file an Amended

Complaint with respect to Counts Five, Six, Nine and Ten – thus Bankers First was no longer

included in the case (Dkt. Entry 135); Plaintiff Charmaine Cooper agreed to the dismissal of

---

[6]Plaintiffs voluntarily withdrew their claim under HOEPA against all Defendants except Bank One.

[7]Plaintiffs did amend their complaint, resulting in the dismissal of the UTPCPL claims against the Lender Defendants as well as dismissal of the RESPA claim.

[8]The Complaint omitted a Fourth Claim of Relief.

4

Bank of America (Dkt. Entry 178); the PK Defendants agreed to dismiss without prejudice their cross-claim against IndyMac (Dkt. Entry 197); and Defendant New Century Mortgage Corporation filed a Suggestion of Bankruptcy, thus staying this litigation as to it.  (Dkt. Entry 228.)

As a result of pretrial rulings and voluntary dismissal of parties and claims, the following are the extant claims of each group of Plaintiffs: Rayon McLean and Natalie Wilson have RICO and UTPCPL claims against the PK Defendants and Lisa Gibson.  Almus and Marilyn Wilson have RICO and UTPCPL claims against the PK Defendants and Lisa Gibson, as well as a RICO conspiracy claim against Firstar and Ocwen.  Marco and Maria Yagual have RICO and UTPCPL claims against the PK Defendants as well as a RICO conspiracy claim against the IMC Defendants.  Finally, Charmaine Cooper has RICO and UTPCPL claims against the PK Defendants and Jenny Centrella, as well as a RICO conspiracy claim against M&T Bank.

Following discovery, the remaining Defendants moved for summary judgment. Additionally, Defendant IndyMac has filed a Motion for Summary Judgment on its Counterclaim against Natalie Wilson.  (Dkt. Entry 287.)  The motions have been fully briefed and are now ripe for resolution.

## II.  BACKGROUND

Because the seven (7) Plaintiffs in this case purchased four (4) different properties and obtained their financing and appraisals from different entities, the factual background of each

5

property and the parties involved will be set forth separately.[9]

### A.  Natalie Wilson and Rayon McLean

After reading advertisements in New York City newspapers and a booklet provided by Harmon Homes, Plaintiffs Natalie Wilson and Rayon McLean traveled to the Pocono Mountain region of Pennsylvania to investigate the homes for sale.  (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, Dkt. Entries 181-3 to -4, at 156a, 246a-247a.)  Thereafter, following several telephone conversations and additional visits to Pennsylvania,  Ms. Wilson selected Lot 9 in Orchard View Estates, Monroe County, and executed an agreement for the purchase of this property from Eagle Valley Homes. (Id. at 117a, 118a.)

Ms. Wilson made a down payment on her home in two separate installments:  $2,000 on July 2, 2000 (id. at 124a), and $8,000 on July 14, 2000. (Id. at 125a-126a.)  On July 16, 2000, Ms. Wilson paid for an appraisal and credit report, and also signed a mortgage application, authorizing Nations 1st Mortgage Co. to obtain financing for her home.[10]  (Id. at 124a, 126a.)  It is disputed whether the PK Defendants disclosed to Ms. Wilson and Mr. McLean that they

---

[9]The common thread in each property is the PK Defendants, who owned the property, sold the property, and brokered the financing for three of the four properties.

[10]Ms. Wilson asserts that she did not sign the loan application, although her signature does appear on the document under the line marked, "Acknowledgment and Agreement."  (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, at 210a, 130a.)  Ms. Wilson has put forth no evidence indicating the signature was forged.  Ms. Wilson has merely pointed to the fact that she did not sign the application on the line where the borrower confirms that he or she has not knowingly made any false statements in the application. (Id. at 131a.)

owned and controlled Nations 1st Mortgage Co.[11] (Id. at 148a.)

Ms. Wilson and Mr. McLeans' attempt to secure financing to construct a home ultimately failed when Nations 1st Mortgage Co. could not obtain a lender.  As a result, Ms. Wilson and Mr. McLean wanted to withdraw their deposit, but Nations 1st Mortgage Co. allegedly insisted on keeping the deposit and purportedly coerced Ms. Wilson and Mr. McLean into purchasing an already constructed home on Lot 8 in Mountain Terrace. (Id. at 207a-208a.)[12]

After Ms. Wilson decided to purchase Lot 8 in Mountain Terrace, Nations 1st Mortgage Co. obtained two mortgages for her, the first mortgage from IndyMac Bank in the amount of $188,000 and the second mortgage from Bank One in the amount of $47,000. (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, at 132a-135a.)  The PK Defendants allegedly advised Ms. Wilson and Mr. McLean that the assistance of an attorney at the closing would not

_____

[11]In her deposition, Ms. Wilson admits that she knows Eagle Valley Homes and Nations 1st Mortgage Co. are affiliated, but she does not indicate, and Defendants do not inquire, whether she obtained this knowledge before or after utilizing the services of Nations 1st Mortgage Co.  (PK Defs.' Am. Supp. App. Reply Mem., Dkt. Entry 199-2, at 21s.)

[12]The PK Defendants contend they did not pressure or threaten Ms. Wilson and Mr. McLean, but insist that Ms. Wilson and Mr. McLean decided to purchase the home based on a sales presentation.  (PK Defs.' Am. Reply Mem., Dkt. Entry 199, at 4.)  Likewise, Trudy Check, a salesperson for Eagle Valley Homes Inc., contends that Ms. Wilson and Mr. McLean insisted on buying the bigger home located on Lot 8 in Mountain Terrace and that the PK Defendants never refused to return Ms. Wilson's deposit. (Defs.' Am. Supp. App. Reply Mem., Dkt. Entry 199-2, at 13s.)

be necessary.[13]  (Id. at 227a.)

Ms. Wilson executed the mortgage agreements on September 11, 2000, and September 14, 2000, respectively.  (PK Defs.' App. Mem. Supp. Summ. J. Re:  Wilson & McLean, at 132a-135a.)  At the closing of the second mortgage with Bank One, Ms. Wilson had insufficient funds to close, so the PK Defendants lent her an additional $2,598.65 to cover the difference between her loans and the total costs (including closing costs).[14]  (Id. at 136a.)

As part of the loan application process, Lisa Marie Appraisal Service appraised Ms. Wilson's property on August 7, 2000, at $235,000, and subsequently submitted the appraisal to IndyMac Bank.[15]  (Id. at 137a-146a.)  Ms. Wilson and Mr. McLean assert that the appraisal

---

[13]The PK Defendants claim that they gave Ms. Wilson the opportunity to obtain her own financing through another lender and to consult an attorney.  (PK Defs.' Am. Supp. App. Reply Mem., at 13s.)

[14]Ms. Wilson asserts she never completed a home loan application with Bank One or had any knowledge of the second mortgage until December 3, 2003. (Id. at 148a.)  In response, the PK Defendants point to the Good Faith Estimates signed by her on August 6, 2000, which contain a detailed accounting of the loan and the estimated monthly payments. (Id. at 211a-212a.)  The monthly payments were estimated to be $1,740.81 for the first loan and $579.29 for the second loan. (Defs.' App. Mem. Supp. Summ. J. Re:  Wilson & McLean, at 211a-212a.)  The monthly payments were ultimately $1,495.00 for the first loan and $545.00 for the second loan.  (Id. at 191a.)  Plaintiffs, in contradiction of the Good Faith Estimates, testified they were told by the PK Defendants that their mortgage payments would be between $800 and $1000 per month.  (Defs.' App. Mem. Supp. Summ. J., at 213a.)

[15]The Commonwealth of Pennsylvania, Bureau of Professional and Occupational Affairs conducted an investigation of the appraisals performed by Lisa Gibson.  The investigation focused on three properties appraised by Lisa Gibson;  Ms. Wilson and Mr. McLeans' property was not one of the three.

proved problematic because it listed the acreage and square footage of the structure incorrectly, and included a non-existent hood range, fire place, refrigerator, washer and dryer. (Id. at 148a.)  In 2003, after seeing a copy of their appraisal, (id. at 147a), Ms. Wilson and Mr. McLean felt the appraisal was wrong and purportedly commissioned an appraisal of their property.

Thomas Hill, the Chief County Assessor for the Monroe County Assessor's Office, relying on an equalized property value from the year 1989, valued Ms. Wilson and Mr. McLeans' property at $139,132.  (PK Defs.' App. Mem. Supp. Mot. Summ. J. (Aff. Hill ¶ 8.), Dkt. Entry 181-4, at 232a.)  The appraisal commissioned by Ms. Wilson and Mr. McLean purportedly valued the property at $175,000.  Ms. Wilson and Mr. McLean have not included the latter appraisal in the record or indicated by whom it was performed.  IndyMac Bank also hired an appraiser, who conducted a review appraisal of Lisa Marie Service's original appraisal. The IndyMac appraiser concluded that the accurate value of the property in August of 2000 was $233,000.  (Id. at 149a-153a.)  Finally, the PK Defendants allegedly conducted another appraisal which valued the property as of January of 2004 at $258,000.[16]  (PK Defs.' Mem. Supp. Motion Summ. J. Re:  Wilson & McLean, Dkt. Entry 181, at 4.)

---

[16]Defendants contend, and Mr. McLean concedes, that an appraisal was conducted in January of 2004 valuing his property at $258,000.  (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, Dkt. Entry 181-4, at 255a.)  However, like Ms. Wilson and Mr. McLeans' two other appraisals, the record does not include this appraisal.

Mr. McLean experienced financial hardships after September 11, 2001, when the barbershop where Mr. McLean worked raised the price on the chairs he rented.  (PK Defs.' App. Mem. Supp. of Summ. J. Re:  Wilson & McLean, at 154a-157a, 242a-245a.)  Mr. McLean then switched his employment and drove trucks for several different companies.  (Id. at 241a-242a.)  Meanwhile, Ms. Wilson and Mr. McLean received financial assistance from charitable organizations such as the American Red Cross and Salvation Army in the amounts of $3,312.78 and $1,638.48.  (Id. at 249a.)  Finally, when Ms. Wilson and Mr. McLean could no longer afford the mortgage payments on their home, they attempted to refinance, but to no avail.  (Id. at 224a.)

Ms. Wilson and Mr. McLean claim that, because the actual worth of their home was substantially less than its initial appraised value (the alleged inflated appraisal), they were unable to refinance their home.  (Id.)  No corroborative evidence for this assertion has been supplied.  Ms. Wilson and Mr. McLean filed applications for the Emergency Mortgage Assistance Program with the Pennsylvania Housing Finance Agency, but were denied.  (Id. at 190a, 191a; PK Defs.' Mem. Supp. Mot. Summ. J. Re:  Wilson & McLean, at 5.)  They then decided to bring this law suit.  At the time of the commencement of this litigation, Ms. Wilson and Mr. McLean had halted mortgage payments and IndyMac Bank had instituted a foreclosure action on the property.  (Id. at 184a-187.)

### B.  Almus Wilson and Marilyn Wilson

In the Spring of 1999, Almus Wilson and his wife, Marilyn Wilson, after reading advertisements similar to those read by Mr. McLean and Ms. Wilson, traveled from their home in Queens Village, New York to visit Eagle Valley Homes in the Pocono Mountains of Pennsylvania.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Wilsons, Dkt. Entry 240-5, at 198a-200a.)  Following the visit, the Wilsons and Eagle Valley Homes exchanged several phone calls, discussing the potential purchase of a home.  (Id. at 205a.)  On June 20, 1999, the Wilsons executed an Agreement for the Sale of Real Estate for Lot #503 in Candlewood Estates, Tunkhannock Township, Monroe County, Pennsylvania, for the amount of $184,900.[17] (Sale of Real Estate Agreement, Dkt. Entry 240-3, at 116a-b.)  The Wilsons made an initial down payment of $6,000 and paid an additional $1,000 on July 7, 1999.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re: Wilsons, Dkt. Entry 240-6, at 293a-294a.)

On July 6, 1999, the Wilsons filled out a Uniform Residential Loan Application for $165,600 in order to secure financing for their home.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Wilsons, Dkt. Entry 240-3, at 122a-123a.)  The next day, the Wilsons received a Good Faith Estimate from Eagle Mountain Mortgage Co., estimating their monthly payments at

---

[17]Marilyn Wilson did not recall any extensive sales pressure on the part of the PK Defendants.  (Marilyn Wilson Dep., Dkt. Entry 240-5, at 204a.)

$1,623.99.[18]  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Wilsons., Dkt. Entry 240-4, at

124a.)  As part of the loan process, Lisa Marie Appraisal Service, Inc. performed an appraisal

of the property and newly constructed home on July 15, 1999, assessing a value of $195,000.

(Id. at 125a-134a.)

At the closing on August 4, 1999, the Wilsons signed a Note and Mortgage Agreement

in favor of New Century Mortgage Corp. in the amount of $166,140 at an 8.95% annual interest

rate.[19]  (Id. at 143a-152a.)  The Wilsons also signed a Prepayment Rider Adjustable Rate Loan

and an Adjustable Rate Rider Addendum.  (Id. at 153a-154a.)  When the financing came up

short, the PK Defendants lent the Wilsons $9,200 to cover the remaining costs.  (Id. at 142a-

143a.)

The Wilsons, at an unspecified date, went to the Monroe County Tax Assessor's Office,

and saw that their property was valued at $117,889.[20]  (Pls.' App. D, Dkt. Entry 250, at 111.)

The Wilsons commissioned Charles Roth to conduct an appraisal.  In a report dated May 16,

---

[18]Later that month, on June 30th, the Wilsons received another Good Faith Estimate
from Eagle Mountain Mortgage Co., estimating their monthly payments at $1,750.55.  (PK
Defs.' App. Mem. Supp. Mot. Summ J. Re:  Wilsons., Dkt. Entry 240-3, at 118a.)

[19]For the first thirty-six months, the Wilsons were required to make a monthly payment of
$1,332.99.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Wilsons., Dkt. Entry 240-4, at
155a.)

[20]Evidently, the Wilsons did not understand that the values shown on County Assessor
records reflect a base year of 1989, ten years before the Wilsons acquired their property.

2001, Mr. Roth valued the Wilsons' property at $150,000, some $35,000 less than they had paid for it.  (Id. at 123-134.)  Ocwen Realty Advisors also solicited Nasser Appraisal Service, Inc. to perform an appraisal of the Wilsons' property.  Nasser Appraisal Service, Inc. valued the Wilsons' property at $140,000 as of February 22, 2002.[21]  (Id. at 112-114.)

On August 12, 1999, New Century assigned the Wilsons' loan to Defendant Firstar.[22] (Ex. H, Dkt. Entry 235-4, ¶ 7.)  On August 1, 2001, New Century transferred the servicing rights on the Wilsons' loan to Defendant Ocwen.  (Ex. S, Dkt. Entry 235-7, at 6.)  There is no dispute that Ocwen was not involved in the marketing of property or financing the transaction.  (Ex. F, Dkt. Entry 235-3, ¶¶ 12-16.)

As noted above, the Commonwealth of Pennsylvania conducted an investigation of the appraisals performed by Lisa Gibson.  (Consent Agreement, Dkt Entry 249, at 84-106.)  The investigation focused on three properties appraised by Lisa Gibson, one of which was the property bought by Almus and Marilyn Wilson.  As a result of its investigation, the Commonwealth initiated a proceeding against Lisa Gibson before the State Board of Certified Real Estate Appraisers.  The action ultimately settled when the parties reached an agreement, resulting in the assessment of a $3,000 penalty, the costs of investigation, and a twelve month

---

[21]Ocwen then prepared a modification agreement for the Wilsons, which they rejected.

[22]On April 2, 2007, Defendant New Century filed a Chapter 11 bankruptcy Petition in the Bankruptcy Court for the District of Delaware.  Accordingly, this action is stayed against New Century.  (Suggestion of Bankruptcy, Dkt. Entry 228.)

suspension followed by a period of probation.    In the agreement, Lisa Gibson (identified as the

Respondent) made the following admissions:

> d.  Respondent represented that the land use described neighborhood at the time of the appraisals was 100% one family use.

> e.  Contrary to Respondent's representations, more than half the Township of Tunkhannock is dedicated to Open Space-Wetlands (OSW) and there are also small retail businesses, hospitality, a service station, etc., and the Pocono Raceway in close proximity . . . .

> f.  Respondent's representations concerning the Candlewood Court, Estates Drive and Candlewood Estates[23] neighborhood boundaries were unreasonably broad . . . .

> i.  In the neighborhood sections of the Candlewood Court and Estates Drive Appraisals, Respondent represented that the single-family housing values in the neighborhood ranged from a low of $60,000 to a high of $250,000 with a predominant value of $150,000.
>        . . . .

> k.  The true low sales price in the neighborhood (i.e., Tunkhannock Township) during the one (1) year period preceding the effective dates of the Candlewood Court and Estates Drive Appraisals was $18,500.

> l.  The true high sales prices in the neighborhood (i.e., Tunkhannock Township) during the one (1) year period preceding the effective dates of the Candlewood Court and Estates Drive Appraisals was $203,000.
>        . . . .

> q.  Respondent's representations concerning the low, high and predominant sales prices of single-family housing in the Candlewood Court and Estates Drive Property neighborhoods during the one (1) year preceding the effective dates of the Candlewood Court and Estates Drive Appraisals were not supported.
>        . . . .

> v.  In the Sales Comparison Approaches to the Candlewood Court, Estates Drive, and Candlewood Estates Appraisals, Respondent utilized properties of questionable comparability and/or Respondent failed to properly adjust the sales prices to accurately reflect the strengths and weaknesses of

---

[23]The Wilsons purchased a property in Candlewood Estates.

the comparable sale properties.

. . . .

   x.  In each of the Candlewood Court, Estates Drive, and Candlewood Estate Appraisals, Respondent reported the sales price of Comp 2 to be $195,000.

   y.  Contrary to Respondent's representations Comp 2 actually sold for $174,500.

(Consent Agreement, ¶ 4.)  Lisa Gibson adopted these findings in ¶ 12 of the Agreement, when she verified "that the facts and statements set forth in this Agreement are true and correct to the best of Respondent's knowledge, information and belief."[24]   (Id. ¶ 12.)

   In a separate action, the Pennsylvania Attorney General's office initiated a criminal suit against Annette M. Peterson, owner of Mountain Valley Abstract.  During the ensuing trial, Dana Kleintop, a former employee of Eagle Valley Homes and Eagle Valley Mortgage, testified to the manner in which the PK Defendants conducted their business affairs.  Ms. Kleintop testified that the PK Defendants were "using an inflated appraisal for $200,000 when the house

---

  [24]Along with the above-mentioned deficiencies, Lisa Gibson was disciplined for: using the term bituminous concrete in lieu of the term asphalt; failing to include documentary evidence supporting her efforts to obtain agreements for sale, real local figures or cost estimates or other documentation to support appraisal conclusions; using the term "good" to describe the condition of the property; using new construction comparables in lieu of existing sales of homes when the result of such use of new constructions did not substantially impact the value estimate; failing to state a source for the definition of "market value"; failing to prominently state the reporting option; failing to state the intended use of the appraisal; failing to document the development of the "highest and best use" opinion for an appraised property; utilizing incomplete or incorrect deed, map, census, FEMA and/or map references; stating "None Obs" when items were readily observable; presenting a site value without support for the determination; failing to include appropriate information in the sales history areas; and failing to sign the appraisal reports in the required manner.  (Consent Agreement, ¶ 11.)

was truly being purchased for $180,000," falsifying sales agreements and other documents,

inflating sale prices, and using the HUD-1 Statements to cover the fact that the borrowers did

not have down payments.[25]  (Kleintop Dep., Dkt Entry 255, at 307, 311.)

On March 23, 2006, Defendants Parisi and Kishbaugh signed a Consent Petition to

resolve criminal charges filed against them by the Office of Attorney General, Bureau of

Criminal Prosecutions.  (Pls.' App. F, Dkt. Entry 246, at 244.)  In the agreement, the PK

Defendants agreed to refrain from violating certain provisions of the Pennsylvania Consumer

Protection Law, the Federal Truth in Lending Act, 15 U.S.C. §§ 1601-1605, and Regulation "Z",

12 C.F.R. 226, et seq.  Defendants Parisi and Kishbaugh agreed to be permanently enjoined

from any business activity as a mortgage banker, mortgage broker, or mortgage salesperson in

Pennsylvania.  (Id. at 246.)

Parisi also agreed to remit to the Commonwealth of Pennsylvania the sum of

$1,000,000 in restitution, penalties and costs, and pay $750,000 to the Commonwealth of

Pennsylvania to be used to create a consumer restitution fund for the forty-one (41) consumers

who filed complaints against the PK Defendants.  (Id. at 248.)  One criterion guiding

disbursements from the fund was "the amount of any 'bona fide' disparity between the appraisal

originally obtained when buying/building a home and a subsequent appraisal by a Pennsylvania

---

[25]Rose Purdue, in a sworn affidavit, stated that Ms. Kleintop did not work for the PK Defendants at the time the Wilsons purchased of their property.  (Rose Perdue Aff., Dkt. Entry 261-2, at 5s.)

licensed appraiser."  (Id.)  The Consent Petition anticipated that Parisi would enter a plea of

"nolo contendere" to one count of forgery, and Kishbaugh would enter a plea of nolo

contendere to one count of securing execution of documents by deception.  (Id. at 250-251.)

The PK Defendants entered this agreement without any admission of wrongdoing.  (Id.)

### C.  Marco and Maria Yagual

Marco and Maria Yagual, similar to the other Plaintiffs, read several advertisements

circulated in publications near their home in New Jersey listing homes and properties for sale

by the PK Defendants.  The Yaguals then decided to travel to the Pocono Mountain Region of

Pennsylvania to see the properties and tour the homes.  After several phone calls and meetings

with the PK Defendants, on August 12, 2001, Mr. Yagual entered into a sales agreement to

purchase Lot #42, Terrace Drive, Mt. Terrace Estates, Chestnuthill, Pennsylvania for the price

of $44,000.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Yaguals, Dkt. Entry 223-2, at

116a.)  On that same day, Mr. Yagual executed a purchase order for the construction of a two-

story home in the amount of $158,000.  (Id. at 117a-118a.)  Mr. Yagual stated that he was not

subjected to any excessive sales pressure by the PK Defendants in purchasing his home.  (Id.

at 166a.)  He also signed an Affiliation Disclosure form acknowledging the common owner of

Eagle Valley Homes, Inc., P&K Developers, and Nations 1st Mortgage Company.  (Id. at 216a.)

The Yagauls made a $40,000 down payment to Eagle Valley Homes and P&K

Developers, Inc., (id. at 165a), and later, on August 12, 2001, executed a series of documents

17

with Nations 1st Mortgage Company, which included a Borrower's Certification and

Authorization, Mortgage Broker Fee Agreement, Servicing Disclosure Statement, Internal

Revenue Form 4506, Borrower's Certification and Acknowledgment, Mortgage Loan Origination

Agreement, Notice of Applicant Right to Receive Copy of Appraisal Report, Housing Financial

Discrimination Act of 1977 Fair Lending Notice, and Disclosure Notices.  (Irwin's Statement of

Facts, Dkt. Entry 218, ¶ 4.)

On September 9, 2001, Mr. Yagual signed a Good Faith Estimate procured by Nations

1st Mortgage Company for a mortgage in the amount of $178,269 with an annual interest rate

of 9%.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Yaguals, Dkt. Entry 223-4, at 139a;

Yaguals' Statement of Facts, Dkt. Entry 238, ¶ 9.)  The estimated monthly interest payment

was $1,905.39.  (Id.)  On November 8, 2001, Nations 1st Mortgage Company prepared another

Good Faith Estimate, which included Mr. Yagual's down payment of $40,000, for a mortgage of

$170,500 at an interest rate of 8.25% and a monthly payment of $1,607.33.[26]  (PK Defs.' App.

Mem. Supp. Mot. Summ J. Re:  Yaguals, Dkt. Entry 223-4, at 140a; Ex. F, Dkt. Entry 219.)

These estimates were based on an appraisal performed by Stan Cheslock of NEPA Appraisal

Services on August 17, 2001, valuing the Yaguals' property and home at $206,000.[27]  (Id. at

---

[26]Nations 1st Mortgage Company prepared another Good Faith Estimate, dated August
13, 2001, for a total loan amount of $170,637 at an annual interest rate of 8.250% and a
monthly payment of $1,607.61.  (PK Defs. App. Mem. Supp. Mot. Summ J. Re:  Yaguals, Dkt.
Entry 223-4, at 138a.)

[27]Neither Cheslock nor NEPA Appraisal Services is a party to this lawsuit.

18

125a-137a.)

The closing took place on December 14, 2001, at which Mr. Yagual executed a Note in favor of IMC Mortgage in the amount of $170,500 with an interest rate of 8.25% and a monthly payment of $1280.91, and a mortgage on the property in favor of IMC Mortgage.  (Exs. G, H & I, Dkt. Entry 220.)  Mr. Yagual asked whether he would need an attorney and was told he would not.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Yaguals, Dkt. Entry 223-5, at 220a.)  Mr. Yagual also received a Notice of Assignment and a Notice of Sale or Transfer of Servicing Rights from IFC Mortgage to Irwin Mortgage Corporation.  (Irwin's Statement of Facts, ¶ 9.)

Shortly after the closing, the Yaguals received their 2002 tax notice, which increased due to the improvements on their property.  As a result, the Yaguals allegedly contacted the Monroe County Assessment Office, who had valued their property at $129,948 for tax purposes.  Suspecting some type of fraud, the Yaguals allegedly commissioned independent appraiser Scott Evans, who appraised their property at $177,000 as of June 16, 2003.[28]  (Ex. N, Dkt. Entry 220, at 58-59.)

The Yaguals filed a complaint with the Pennsylvania Attorney General's Office, Bureau of Consumer Protection.  The PK Defendants, as indicated in the Wilsons' case, negotiated a

---

[28]Mr. Yagual conceded that he did not know who Scott Evans was and that he never had any conversations with him, nor saw any appraisal performed by him.  (Ex. M, Dkt. Entry 220, at 55.)  Mrs. Yagual, however, testified that she spoke to Scott Evans and asked him to perform an appraisal.  She promised to provide Scott Evans' appraisal to her attorney, but the appraisal has not been submitted to the Court.  (Ex. N, Dkt. Entry 220, at 58-59.)

Consent Petition with the Attorney General in which, <u>inter alia</u>, they pleaded "nolo contendere" to the counts of fraud against them.

In 2002, Mr. Yagual acquired employment as a longshoreman making $16 per hour. (PK Defs. App. Mem. Mot. Summ J. Re:  Yaguals, at 169a.)  That same year, he halted his mortgage payments.  The following year, Mr. Yagual applied on two different occasions for assistance from the Pennsylvania Housing Finance Agency, (<u>id.</u> at 171a-176a), but was denied on both occasions because he was not suffering financial hardship as required by the agency guidelines.  (<u>Id.</u> at 173a, 176a.)  Mr. Yagual brought this action on August 8, 2004, and subsequently conveyed title of the property to his wife in 2005.  (Ex. J, Dkt. Entry 220, at 45.)

### D.  Charmaine Cooper

After reading advertisements in the New York Dally News of homes for sale, Plaintiff Charmaine Cooper became interested in owning her own home.  (Cooper Dep., Dkt. Entry 269-5, at 22.)  Ms. Cooper then decided to travel to the Pocono Region of Pennsylvania to explore the possibility of purchasing a home.  (PK Defs.' App. Supp. Mot. Summ. J. Re:  Cooper, Dkt. Entry 281-6, at 290a.)  She looked at homes owned by LTS, a real estate company in the area, but decided against purchasing from it.  (<u>Id.</u> at 290a-291a.)  Later, Ms. Cooper contacted Eagle Valley Homes and, after receiving a promotional video and printed materials, scheduled an appointment to view its homes.  (<u>Id.</u> at 293a.)

On January 16, 1999, after viewing several homes owned by Eagle Valley Homes, Ms.

Cooper agreed to purchase Lot 501, Candlewood Estates, located in Tunkhannock Township, Monroe County, Pennsylvania.  (Cooper's Statement of Facts, Dkt. Entry 285, ¶ 1.)  She executed an Agreement of Sale for Real Estate with Steve Parisi and Donald Kishbaugh in the amount of $29,500.  (Id. at ¶ 2.)  On February 27, 2009, Ms. Cooper signed a Construction Agreement with Eagle Valley Homes for $165,500.  (PK Defs.' App. Supp. Mot. Summ. J. Re: Cooper, Dkt. Entry 281-3, at 118a-119a.)

Ms. Cooper applied for financing with Bankers First.  (M&T's Statement of Facts, Dkt. Entry 267, at ¶ 2.)  Bankers First, in response, provided Ms. Cooper with two Good Faith Estimates regarding a potential mortgage, which disclosed an estimated loan amount of $185,000, an interest rate of 7.75%, and a total monthly payment of $1,670.61.  (PK Defs.' App. Supp. Mot. Summ. J. Re:  Cooper, Dkt. Entry 281-3, at 125a-126a.)  The Good Faith Estimates, dated February 23, 1999, advised Ms. Cooper of her obligation to pay real estate taxes as well as premiums for private mortgage and hazard insurance.  (Id.)  The PK Defendants do not operate or manage Bankers First.  (Id. at 320a.)

As part of the loan process, Jenny Centrella, a Pennsylvania licensed real estate appraiser, performed an appraisal on Ms. Cooper's property for Bankers First.[29]  (Jenny Centrella's Statement of Facts, Dkt. Entry 258-2, ¶ 8.)  Ms. Centrella priced Ms. Cooper's property at $197,500 as of March 3, 1999.  (Id. at ¶ 10; PK Defs.' App. Supp. Mot. Summ. J.

---

[29]There is no evidence that Bankers First is affiliated with the PK Defendants.

Re:  Cooper, Dkt. Entry 281-4, at 136a-147a.)

Some time in February or March of 1999, M&T, successor in merger to Keystone,

received a request to evaluate the financing needs of Ms. Cooper.  (Aff. Sheri Edwards, Dkt.

Entry 268, ¶ 9.)  According to Sheri Edwards, an Administrative Vice President of M&T, M&T

did not contract to provide financing with Bankers First, but independently evaluated Ms.

Cooper's loan application using appropriate due diligence and underwriting.  (Id. at ¶ 12.)

M&T's evaluation of the transaction included an assessment of the reliability of the Centrella

appraisal.[30]

The closing on Ms. Cooper's home took place on April 16, 1999.  (Cooper's Statement

of Facts, ¶ 10.)  At the closing, Ms. Cooper executed a mortgage in the amount of $185,000 in

favor of M&T.  (Aff. Sheri Edwards, ¶ 3.)  Ms. Cooper also executed a HUD-1 Settlement

Statement, (Ex. 17, Dkt. Entry 269-2, at 21-22), a Uniform Residential Loan Application, (Ex.

12, Dkt. Entry 269-2, at 9-13), a Construction Loan Agreement (which later converted to a

permanent conventional loan), (Ex. 33, Dkt. Entry 269-3, at 32-33), two Truth in Lending

---

[30]Specifically, Sheri Edwards affirmed that M&T did the following: confirmed the location of the property and neighborhood; verified that the property values in the area were stable; took note of market conditions; confirmed that all the features of the property were common and acceptable for the area; verified that the appropriate comparables were used; and verified the net and gross adjustments taken by the appraiser with respect to the comparable properties. (Aff. Sheri Edwards, Dkt. Entry 268, ¶¶ 18-24.)  M&T also underwrote Ms. Cooper's loan consistent with Freddie Mac underwriting guidelines, (id. at ¶ 27), and employed a Uniform Underwriting and Transmittal Summary in the review of Ms. Cooper's Loan.  (Ex. C, Dkt. Entry 268-2, at 23-24.)

Disclosures, advising that the estimated monthly payments would be $1,447,14, (Exs. 34 & 35, at 34-35), a Construction Disbursement Schedule, (Ex. 37, at 37), and an Acknowledgment of Modification of Fees, which reflected estimates of the charges Ms. Cooper would likely incur if she modified her construction loan.  (Ex. 38, at 38.)

Later, on July 19, 1999, Ms. Cooper executed a Note Modification Agreement with M&T, promising to pay M&T $185,000 at an annual interest rate of 7.75% over thirty years, with a monthly principal and interest payment of $1,325.37.  (Ex. 18, Dkt. Entry 269-2, at 23.)  She also executed a Monthly Payment Letter, advising her of the required monthly payments of $1,696.98, (Ex. 40, Dkt. Entry 269-3, at 43), a Truth in Lending Disclosure statement, and a Uniform Residential Loan Application based on the final modified terms.  (Exs. 39 & 41, at 39-41, 44.)  In August of 1999, M&T sold Ms. Cooper's mortgage loan to Bank of America Mortgage.  (Ex. 42, at 45.)

In 2001, Ms. Cooper contacted the Monroe County Assessor's Office, and learned that her property was valued at $137,214.  Because the value was dramatically lower than her original appraisal, Ms. Cooper commissioned an appraisal by Mr. Charles E. Roth, who appraised her home at $140,000 as of April, 12, 2002. (PK Defs.' App. Supp. Mot. Summ. J. Re:  Cooper, Dkt. Entry 281-5, at 197a-211a.)  Another appraisal was performed by Hubbard Real Estate, which valued Ms. Cooper's home at $251,000 as of June 8, 2003.  (Id. at 213a-215a.)

In 2003 or 2004, Ms. Cooper stopped making payments on her loan with Bank of America.  (Cooper Dep., Dkt. Entry 269-5, at 78.)  She filed for bankruptcy protection on two separate occasions.   In 2004 she made a few mortgage payments while under bankruptcy protection, but was dismissed from bankruptcy because she failed to continue making those payments.  (Id. at 80.)  In 2006 her bankruptcy proceeding was dismissed because she failed to attend credit counseling.  (Id. at 84.)  On October 10, 2006, Ms. Cooper agreed to a Loan Modification Agreement with Bank of America, in which her indebtedness under the loan and principal owed were added together for a total of $241,182.45.  (Ex. 43, Dkt. Entry 269-4.)[31]

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). "Facts that could alter the outcome are material facts."  Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994).  "[S]ummary judgment will not lie if the dispute about a material

---

[31]As a consequence of the execution of the Loan Modification Agreement, Ms. Cooper's claims against Bank of America in this action were dismissed.

fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment if there was adequate time for discovery and a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## B. RICO Principles

Central to each Plaintiff's claim is the appraisal that supported the financing for each transaction. Defendants contend that there is no admissible evidence of an inflated appraisal of the property each plaintiff purchased. Absent an inflated appraisal, argue the Defendants,

25

Plaintiffs cannot show any injury attributable to a pattern of racketeering activity.

The Racketeering Act provides civil damages for "any person injured in business or property by reason of a violation of 18 U.S.C. § 1962." 18 U.S.C. § 1964(c) (1995) (emphasis added). The question of whether a plaintiff made out a claim of injury to his or her business or property as a result of a pattern of racketeering activity in violation of RICO has been described as a standing issue. See Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000) (considering standing in the context of whether appellants have alleged a valid RICO injury to business or property); see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 520 (3d Cir. 1998) (pointing to section 1964(c) as the "standing requirement" for RICO suits). Along with the Article III constitutional and prudential standing requirements, a plaintiff seeking recovery under RICO must satisfy the additional standing requirement of injury to property or business as a proximate result of the alleged pattern of racketeering activity.[32] See Maio, 221 F.3d at 482.

A plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business and property by the conduct constituting the [RICO] violation." Sedima, S.P.R.L., v. Imrex Company, Inc., 473 U.S. 479, 496 (1985). The Third Circuit has read section

---

[32]Recovery on a fraud claim is likewise dependent upon proof of "the difference in value between the real, or market value, of the property at the time of the transaction and the higher, or fictitious value, which the buyer was induced to pay for it." Skurnowicz v. Lucci, 798 A.2d 788, 795 (Pa. Super. Ct. 2002).

1964(c) "as requiring two distinct threshold showings: (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962."  Maio, 221 F.3d at 483.  Thus, whether viewed as a standing or substantive merits question, the ability of any Plaintiff to recover in this action depends upon proof of a fraudulent appraisal.

In the instant case, in order to show a cognizable injury, Plaintiffs must set forth competent evidence that their property was overvalued.   If Plaintiffs' property was indeed overvalued, then they paid more than its fair market value, paid more in interest, and incurred a concrete injury as a result of the allegedly fraudulent appraisal that is the linchpin of the RICO claims.  See Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 249 (3d Cir. 2001) (finding that "when a defendant fraudulently misleads individuals into purchasing equity interests in real property, an injury occurs at the time of investment"); Maio, 221 F.3d at 489 (reasoning that when a property interest of tangible nature is at stake, an injury to that property may be demonstrated by reference to external conditions or the occurrence of events which cause the value of the real or personal property to be reduced); Heinold v. Perlstein, 651 F. Supp. 1410, 1411 (E.D. Pa. 1987) (finding that even though the plaintiff was induced by misrepresentations as to the value of the diamond ring, the plaintiff did not suffer an injury in purchasing the ring because he did not pay more than its fair market value).

27

### C.  The Wilson/McLean RICO Claims

Ms. Wilson and Mr. McLean have not set forth competent evidence that their property was overvalued. The sole evidence in favor of Plaintiffs' allegations that the PK Defendants overstated the fair market value of the property is Ms. Wilson's testimony.  (PK Defs.' App. Mem. Supp. Mot. Summ. J. Re: Wilson & McLean, at 213a, 220a.)  A party cannot simply rely on allegations, but must put forth evidence.  Fed. R. Civ. P. 56(e).   The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Anderson, 477 U.S. at 257).  The nonmoving party cannot "simply reassert factually unsupported allegations contained in [the] pleadings."  Williams, 891 F.2d at 460 (citing Celotex, 477 U.S. at 325).

According to the HUD-1 Settlement statements dated September 11, 2000, and September 14, 2000, Ms. Wilson and Mr. McLean purchased their home for $235,000.  (PK Defs.' App. Mem. Supp. Mot. Summ. J. Re:  Wilson & McLean, Dkt. Entry 181-3, at 132a-135a.)  The value of the home was based on an appraisal performed on August 7, 2000, by Lisa Marie Appraisal Service. (Id. at 137a-146a.)  The PK Defendants have provided the complete ten page appraisal along with a review appraisal conducted by Lucarelli Appraisal Group on February 11, 2004. (Id. at 149a-153a.)  The purpose of the review appraisal was to verify the accuracy of the factual data and conclusions, and to determine the reasonableness of

the value opinion expressed in the Lisa Marie appraisal report.  (Id. at 150a.)  The Lucarelli

report concluded that the market value of the real property was $233,000 as of August 7, 2000,

the effective date of the original appraisal report. (Id. at 151a.)  The value attributed to the

property by the review appraisal indicates that the Lisa Marie appraisal was not grossly inflated

as suggested by Plaintiffs.[33]

Ms. Wilson and Mr. McLean submit as proof of their property's lower market value their

testimony as to what they saw at the Monroe County Assessor's Office in 2003. (Wilson &

McLeans' Br. Opp'n PK Defs.' Mot. Summ. J., Dkt. Entry 191, at 3; PK Defs.' App. Mem. Supp.

Mot. Summ. J. Re: Wilson & McLean (Aff. Hill ¶ 8.), Dkt. Entry 181-3, at 147a.)  The Monroe

County Assessor's Office valued their property at $139,132 pursuant to 72 P.S. § 5453.602,

which permits a county to adopt a base year market value in assessing properties.  Monroe

County has adopted a base year of 1989, the year of the last county-wide reassessment.  (PK

Defs.' App. Mem. Supp. Mot. Summ. J. Re:  Wilson & McLean (Aff. Hill ¶ 8.), Dkt. Entry 181-4,

at 231a-234a.)  According to Thomas Hill, the Chief County Assessor, the actual value of

$139,132 is an equalized value of the property (land and building), which represents the base

year value of the property.  (Id.; Aff. Hill ¶ 13.)  It follows logically that Monroe County's

appraisal, expressed in terms of the value of the dollar in 1989, would be significantly lower

---

[33]Additionally, Mr. McLean admitted to knowing of an appraisal performed by IndyMac in January 2004 valuing his property at $258,000.  (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, at 255a.)  This appraisal is not included in the record.

than the appraisal conducted on August 7, 2000.  Thus, Monroe County's valuation based on the value of the property in 1989 dollars does not undermine confidence in the appraisal performed by Lisa Marie Appraisal Service.

In addition to the Monroe County appraisal, Ms. Wilson testified that she commissioned an appraisal in connection with her attempt to refinance her home.  (Id. at 122a.)  She testified that the appraisal valued her property $175,000, making it impossible for her to refinance.  (Id.)  Her testimony as to the values expressed in some other appraisal is, of course, hearsay.[34]  This evidence is not competent and cannot be used to defeat summary adjudication of an issue.  See Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (finding that a hearsay statement by an unknown individual is not capable of being admissible at trial); Olympic Junior, Inc., v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d. Cir. 1972) (noting that factual allegations not based on personal knowledge would be insufficient to avoid summary judgment); Gostin v. Nelson, 363 F.2d 371, 371 (3d Cir. 1966).  Neither Plaintiff has identified the appraiser or provided any information from which the identity of the appraiser could be determined.  Nor is there any competent evidence that refinancing could not be secured because there was insufficient value in the property.  The proposed lender or lenders have not been identified.  Ms.

_____

[34]When questioned about these two other appraisals, Ms. Wilson stated she did not have the documents and that her husband handled it.  (PK Defs.' App. Mem. Supp. Mot. Summ. J. Re: Wilson & McLean, at 122a.)   Mr. McLean has failed to produce any record of these appraisals.

Wilson's testimony that refinancing could not be secured is hearsay. There is nothing in the record to indicate that refinancing could not be secured because the property was worth substantially less than the Lisa Marie appraised value. Therefore, the record lacks any competent proof that the property value was less than that presented in the 2000 appraisal.[35]

Ms. Wilson and Mr. McLean insist that they will offer expert testimony at trial as to the real estate market conditions in 2000, but they are required at this stage to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Williams, 891 F.2d at 460 (citations omitted). The trial stage is too late. A defending party cannot be put to the burden and expense of a trial based solely upon a plaintiff's unsubstantiated promise that pertinent evidence will be forthcoming.

Ms. Wilson and Mr. McLean further assert that the interest rate on the mortgages procured by the PK Defendants exceeded market rates. (Wilson & McLeans' Br. Opp'n PK Defs.' Mot. Summ. J., at 9.) To support this allegation, Ms. Wilson and Mr. McLean state that they "will be able to offer expert testimony regarding the market conditions in 2000," (id. at 8), and "believe this rate [11.4%] exceeds market rates."[36] (Id. at 9.) The summary judgment

---

[35]The record does contain, however, a PHFA (Pennsylvania Housing Finance Agency) application for Homeowner's Emergency Mortgage Assistance signed by Ms. Wilson on November 15, 2005. (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, Dkt. Entry 181-3, at 191a.) In Ms. Wilson's application, the market value of the home is represented to be $260,000. (Id.)

[36]The interest rate of 11.4% applied to the second mortgage, securing a debt of $47,000. (PK Defs.' App. Mem. Supp. Summ. J. Re: Wilson & McLean, at 132a, 133a.) Plaintiffs

process, however, does not contemplate allowing the non-moving party to avoid summary adjudication based on expressed intentions to gather evidence.  There is nothing in the record to suggest that the rate imposed was for a subprime transaction. Plaintiffs cannot defeat summary judgment by simply claiming that the interest rate was too high.

In short, Ms. Wilson and Mr. McLean insist that they were defrauded on the value of their property, received an inflated appraisal, and consequently had to take out a larger mortgage loan, pay higher monthly payments, and pay higher interest rates.  As a result of this alleged fraud, when they encountered financial difficulties, they were unable to refinance their home.  All of these injuries stem from the alleged fraudulent estimate of their home's market value.  Since Ms. Wilson and Mr. McLean have not produced competent evidence of an inflated appraisal, the PK Defendants and Lisa Gibson are entitled to summary judgment on the RICO claims.

### D.  Indymac's Counterclaim against Natalie Wilson

Defendant Indymac Bank asserts a counterclaim in mortgage foreclosure and breach of contract, seeking all amounts owed by Ms. Wilson for her Note of September 14, 2000 for $188,000.  (Def. Indymac's Mot. Summ. J., Dkt. Entry 287.)  Claiming she was unable to make monthly payments because of this litigation, Ms. Wilson argues Indymac's Motion for Summary

---

received an interest rate of 8.875% on their first mortgage of $188,000. (Defs.' App. Mem. Supp. Summ. J. Re: Wilson and McLean, at 134a-135a.)

Judgment is premature and should be stayed pending the outcome of this litigation.[37]  (Pl.

Natalie Wilson's Br. Opp'n to Def. Indymac's Mot. Summ. J., Dkt. Entry 297, at 2.)  This Court

has already dismissed Ms. Wilson's claims against Indymac (Dkt. Entry 221).  Ms. Wilson offers

no valid reason why she can merely suspend making all payments on the Note under these

circumstances.  IndyMac, as holder of the Note, is entitled to enforce its terms, even though

Ms. Wilson pursues claims against other entities.  Any recourse she has as to other Defendants

does not relieve her of the obligations created by the Note and Mortgage.

Ms. Wilson's failure to make the payments on the Note is undisputed.  In fact, she

admits that "she has not made mortgage payments since approximately September of 2003."

(Pl. Natalie Wilson's Br. Opp'n to Def. Indymac's Mot. Summ. J., at 2; PK Defs.' App. Mot.

Summ. J. Re:  Wilson & McLean, at 158a.)

"Upon default, the holder of a mortgage can legally proceed to enforce the terms of the

mortgage either by foreclosure proceedings or by obtaining judgment on the bond

accompanying the mortgage and issuing a writ of execution."  Cunningham v. McWilliams,  714

A.2d 1054, 1056-1057 (Pa. Super. Ct. 1998).  "The entry of summary judgment is proper if the

mortgagors admit that the mortgage is in default, that they have failed to pay interest on the

obligation, and that the recorded mortgage is in the specified amount."  Id.  at 1057 (quoting

---

[37]IndyMac moved for entry of summary judgment due to lack of opposition.  (Dkt. Entry
292.)  In light of the filing of an opposition brief, this motion will be denied.

Landau v. W. Pa. Nat'l Bank, 282 A.2d 335, 340 (1971).

Indymac has exercised its right to accelerate the principal, interest, late fees and other amounts due on Ms. Wilson's Note and mortgage.  Indymac seeks payments of principal in the amount of $182,655.72, interest of $63,928.94, late charges of $3,365.55, escrow of $25,154.63, and other fees of $25,058.29, for a total of $301,163.13.  (Soven Decl., Dkt. Entry 288-2, ¶ 8.)  Indymac also requests attorney's fees and costs resulting from Ms. Wilson's default in the amount of $2,500.  (Id. at ¶ 9.)  As the facts are undisputed and the liability is clear, IndyMac's motion will be granted, and judgment will be entered against Ms. Wilson in the requested amount of $303,663.13.

### E.  Almus and Marilyn Wilsons' RICO Claims

#### 1.  The PK Defendants

##### a.  Statute of Limitations

As a threshold matter, the PK Defendants have raised the statute of limitations defense. Civil RICO actions are governed for a four year limitations period.  Agency Holding Corp. v. Malley-Duff & Assoc., 483 U.S. 143, 156 (1987) (selecting a 4-year statute of limitations for civil RICO actions).  Our Court of Appeals has adopted the injury discovery rule to determine when the four (4) year limitations period will begin to run.  Agency Holding Corp. v. Malley-Duff & Assoc., 483 U.S. 143, 156 (1987) (selecting a 4-year statute of limitations for civil RICO actions); Forbes v. Eagleson, 228 F.3d 471, 483-484 (3d Cir. 2000) (adopting the injury

discovery rule).  The injury discovery rule functions to postpone the beginning of the statutory

limitations period from the date when the alleged fraud occurred to the date when the plaintiff

knew or should have known of their injury.  Cetel v. Kirwan Financial Group, Inc.  460 F.3d 494,

507 (3d Cir. 2006).  Our Court of Appeals has recognized that the injury discovery rule contains

both subjective and objective components.  Id.   The subjective component is satisfied "no later

than when the plaintiffs themselves discover their injuries."  Id.   "However, because the

components are disjunctive [the court must] first perform an objective inquiry to determine when

plaintiffs should have known of the basis of their claims, which 'depends on whether [and when]

they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to

excite 'storm warnings' of culpable activity.'"  Defendants have the burden of showing the

existence of "storm warnings," or "any information or accumulation of data that would alert a

reasonable person to the probability that misleading statements or significant omissions had

been made."  Id.

An analysis of the injury discovery rule is extremely fact-specific.  Mathews, 260 F.3d at

250.  "Since the applicability of the statute of limitations usually involves questions of fact for

the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the

challenged claims are barred."  Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 498

(3d Cir. 1985).

The PK Defendants have not met the requisite "heavy burden" of demonstrating that the

Wilsons knew or should have known of their injury before August 6, 2000, four years prior to the commencement of this action.  The PK Defendants contend that the Wilsons were aware of the alleged fraud sometime in the year 1999, or at the latest early 2000, because the Wilsons failed to pay their property taxes in the year 2000.  In support of their argument, the PK Defendants point to the Wilsons' testimony that they stopped paying the property taxes as a result of the alleged fraud.  The PK Defendants further rely on an Account History Listing of the Wilsons' property by the Monroe County Treasurer's Office that contains an accounting of the bills and payments on the Wilson's property.[38] (Account History Listing, Dkt. Entry 278-2, at SA11.)

The Account History Listing and testimony are insufficient to establish as a matter of law that the Wilsons discovered their alleged injury before August 6, 2000.  Almus Wilson testified that he stopped paying real estate taxes sometime in 2001 and 2002, when he discovered "there was fraud involved in the appraisal."  (Supp. App. Statute of Limitations, Dkt. Entry 278-2, at SA4.)  Marilyn Wilson testified she stopped paying real estate taxes as a result of the fraud, namely the inflated appraisal, which occurred after 2000.[39]  (Id. at SA5.)

---

[38]The PK Defendants submit two tax bills issued on January 1, 2000, as evidence that the Wilsons stopped paying their taxes more than four years before filing this lawsuit.  (Supp. App. Statute of Limitations, Dkt. Entry 278-2, at SA12-13.)  The Wilsons' tax bills by themselves do not indicate whether or not the Wilsons ultimately paid their taxes.

[39] Q: You haven't paid real estate taxes?
   A: Well, it was based on fraud.  It's based on fraud.
   Q: Why don't you explain the fraud to me?

The Account History submitted by the PK Defendants is unauthenticated evidence which cannot be considered on a motion for summary adjudication.  The PK Defendants have failed to submit any testimony or foundation giving meaning and context to this document.[40]  See U.S. v. Dibble,  429 F.2d 598, 602 (9th Cir. 1970) ("The foundation is laid for receiving a document in evidence by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery.").

In short, the Wilsons' testimony and the Account History Listing are insufficient to conclude that, as a matter of law, the Wilsons knew of their alleged injury before August of 2000.  Thus, the PK Defendants are not entitled to summary judgment on the statute of limitations defense.[41]

### b.  The Racketeering Act Claims

The mainstay of the PK Defendants arguments is that the Wilsons cannot prove that the

---

A: It's based on fraud, inflated appraisals.
Q: What is the fraud?
A: Inflated appraisals.

[40]Even if considered, it is not clear from the document when in the year 2000 the Wilsons were required to pay their taxes and if the Wilsons ultimately paid them.

[41]Defendants Ocwen and Firstar likewise raise the statute of limitations defense, relying on Cetel v. Kirwan Financial Group, Inc.,  460 F.3d 494 (3d Cir. 2006), claiming the subjective component was satisfied "in 1999 and early 2000, when the Wilsons claim they received higher property tax bills."  (Defs. Ocwen & Firstars' Mem. Supp. Mot. Summ. J, Dkt. Entry 234, at 20.)  Because Firstar and Ocwen are entitled to summary judgment on substantive grounds, i.e., the lack of evidence showing wrongful conduct on their part, their limitations arguments will not be addressed.

price paid for their home exceeded its fair market value, (PK Defs.' Mem. Supp. Mot. Summ. J. Re: Wilsons, Dkt. Entry 240, at 9), nor prove that a scheme to defraud existed or that they were injured or damaged as a result of mail or wire fraud.  (Id. at 11.)  As indicated above with respect to Rayon McLean and Natalie Wilson, plaintiffs are required to make a preliminary showing with competent evidence that they suffered an injury by reason of an inflated appraisal. As asserted at p. 12 of the Wilsons Opposition Brief, "[t]he basis for the conspiracy scheme was the inflated appraisal."  Thus, the viability of their RICO claims turns upon the question of whether they can show a fraudulent appraisal.

In addition to the original appraisal of the property (attributing a value of $195,000), the Wilsons have submitted two other appraisals.[42]  The first appraisal, dated May 16, 2001, valued the Wilsons' property at $150,000.  (Pls.' App. D, at 125.)  The other appraisal, dated February 22, 2002, valued the property at $140,000.  (Pls.' App. D, at 114.)  The difference between the original appraisal conducted in July of 1999 and the appraisal in May of 2001, a little less than two year period, was $45,000.  To give context to this decrease in price, Plaintiffs have submitted "A Study of Mortgage Foreclosures in Monroe County," which reports that the average mean sale price of properties between $25,000 and $500,000 increased from

---

[42]The Wilsons also refer to the valuation of their property on the County Assessor's records.  As explained above, this valuation does not create any question of fact as to the validity of the appraisal.

$94,030.45 in 1999 to $ 110,883.83 in 2001.[43]  ( Pls.' App. E., Dkt. Entry 251, at 209.)  This

evidence supports an inference that the Wilsons' property value was substantially less than the

appraised amount at the time of its purchase.  This evidence, coupled with other evidence

presented in the record, suffices to establish a genuine dispute of fact material to the question

of whether the appraisal performed in connection with the sale of the property was fraudulent

and thereby caused injury to the Wilsons.

In this regard, the Wilsons point to admissions made by Lisa Gibson in the proceeding

before the State Board of Certified Real Estate Appraisers.  In that action, the Wilsons' property

is specifically listed as a property affected by Lisa Gibson's misconduct.  In her settlement

agreement, Lisa Gibson admitted that she improperly performed her appraisal of the Wilsons'

property by misrepresenting, among other things, the land, boundaries and sales prices of the

surrounding properties.  These admissions, coupled with the appraisals performed in 2001 and

2002, are sufficient to support an inference that a fraudulent appraisal caused the Wilsons to

suffer injury to property.

The PK Defendants still contend there is insufficient evidence of a scheme to defraud.

---

[43]The PK Defendants argue that the two appraisals performed in 2001 and 2002 do not
create a genuine issue of material fact as to the value of Plaintiffs' home because values can
vary from date to date, as shown by the two appraisals (one at $150,000, the other at
$140,000).  (PK Defs.' Corrective Reply Mem. Re:  Wilsons, Dkt. Entry 262, at 7).  The PK
Defendants overlook, however, the Study of Mortgage Foreclosures in Monroe County
submitted by the Wilsons, which shows an upward trend in home prices between 1999 and
2001.

(PK Defs.' Mem. Supp. Mot. Summ. J., at 13; PK Defs.' Corrective Reply Mem. Law, Dkt. Entry 262, at 7.)  The Wilsons claim that the PK Defendants violated 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs through a pattern of racketeering activity.

Four elements are required for a § 1962(c) claim: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985 ). "Racketeering activity" is conduct proscribed by a number of specifically identified provisions under Title 18 of the United States Code, which include mail fraud (§ 1341) and wire fraud (§ 1343). 18 U.S.C. § 1961.  A pattern of racketeering activity requires "at least two acts of racketeering activity within a 10-year period." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 229 (1989) (internal citations omitted).

To prove mail or wire fraud, the evidence must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." U.S. v. Antico, 275 F.3d 245, 261 (3d Cir. 2001) (citing United States v. Clapps, 732 F.2d 1148, 1152 (3d Cir.1984); Walter v. Palisades Collection, LLC, 480 F. Supp. 2d 797, 803 (E.D. Pa. 2007) (quoting United States v. Syme, 276 F.3d 131, 142 n.3 (3d Cir. 2002)).  Identical standards apply to the "scheme to defraud" element under both the mail and the wire fraud

statutes.[44] Antico, 275 F.3d at 245 (citing United States v. Boots, 80 F.3d 580, 586 n.11 (1st Cir.1996).

　　　As explained by our Court of Appeals, "a scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'" Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991) (quoting United States v. Pearlstein, 576 F.2d 531, 535 (3d Cir. 1978)). It is not essential that the scheme involve an affirmative misrepresentation, but "the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" Id. (quoting McNally v. United States, 483 U.S. 350, 358 (1987)); see also United States v. Frankel, 721 F.2d 917, 921 (3d Cir. 1983).  The fact finder may infer a defendant's knowledge and intent from circumstantial evidence.  Weaver v. Mobile Diagnostech, Inc., No. 02-cv-1719, 2007 WL 1830712, at *9 (W.D. Pa. June 25, 2007); see also Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258, 270 (3d Cir.1995) (citations omitted).  Proof of specific intent "may be found from a material misstatement of fact made with reckless disregard for the truth."  United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995) (citations omitted).

---

[44]Wholly intrastate use of the mails for fraudulent purposes violates the mail fraud statute, while the wire fraud statute is only violated through the interstate use of the wires. Talley v. Halpern, No. 05-4184, 2005 WL 2002611, at *4 (E.D. Pa. Aug. 16, 2005); see also Stanley v. Int'l Bhd. of Elec. Workers, 207 F. App'x 185, 189 (3d. Cir. 2006).

In this case, there is sufficient evidence that the Wilsons were "deprived of something by deceit" – that they paid more than fair market value for their property as a result of a fraudulent appraisal.  In considering the PK Defendants role in this alleged fraudulent appraisal, a jury could reasonably infer that they knowingly participated in the scheme to defraud, or knew of the inflated appraisal.  Ms. Kleintop testified to alleged fraudulent practices of the PK Defendants. Moreover, Lisa Gibson's admission that she misrepresented the Wilsons' property value in her appraisal would logically implicate the PK Defendants.  As an appraiser, Lisa Gibson would have little motivation to inflate property values except to benefit a party to the transaction.  In contrast, the PK Defendants would have a significant interest in obtaining an inflated appraisal. A jury could infer that Lisa Gibson was working collusively with the PK Defendants.  If a property's value was insufficient collateral to support a loan, a financial institution would refuse to provide the financing, causing the transaction to collapse. Thus, by inflating the property value, the PK Defendants could secure financing.  The PK Defendants could also make a larger profit upon selling the properties.  Considering the totality of the circumstances surrounding the appraisal of the Wilsons' property, there is sufficient evidence for a jury to find the PK Defendants participated in, knew of, or should have known of a scheme to defraud.

The PK Defendants argue that Ms. Kleintop's testimony is irrelevant as to whether the PK Defendants violated RICO in selling a home to the Wilsons.  (PK Defendants' Reply Mem. Re:  Wilsons, Dkt. Entry 262, at 3.)  Evidence is relevant if it has "any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 401 does not impose a high standard. Hurley v. Atlantic City Police Dept., 174 F.3d 95, 110 (3d Cir. 1999). At least at the summary judgment stage, Ms. Kleintop's testimony is relevant to the PK Defendants' business practices and does make it more probable that the PK Defendants engaged in these practices in the Wilsons' case.

The mailing requirement may be satisfied by "innocent" mailings, ones that contain no false information, and mailings that are part of a routine practice. Schmuck v. United States, 489 U.S. 705, 715 (1989); see also Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (1991). Furthermore, "[u]se of the mails and wires does not have to be an essential part of the fraudulent scheme. Rather, it is sufficient if the mailings are incident to an essential part of the scheme or a step in the plot." Gilmour v. Bohmueller, No. Civ.A. 04-2535,  2005 WL 241181, at *6 (E.D. Pa. Jan. 27, 2005) (citing United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1977) (citations omitted). The PK Defendants have not moved for summary judgment on the use of the mails or interstate wires elements. It would appear that the Wilsons could meet these elements. Accordingly, the PK Defendants are not entitled to summary judgment on the Wilsons' Racketeering Act claim.

### 2.  Defendant Lisa Gibson

Lisa Gibson contends that the Wilsons have no evidence to establish that she engaged

in a conspiracy under RICO to inflate real estate prices.[45]  (Lisa Marie Defs.' Br. Supp. Mot. Summ. J., Dkt. Entry 280, at 1.)  As mentioned previously, "a defendant may be held liable for conspiracy to violate section 1962(c) if he *knowingly* agrees to *facilitate a scheme* which includes the operation or management of a RICO enterprise."  Smith, 247 F.3d at 538 (emphasis added); Salinas, 522 U.S. at 64 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."); Dongelewicz, 104 F. App'x at 818.

     As noted above, there is competent evidence that supports an inference that the Lisa Gibson appraisal was a fraud.  A jury could reasonably conclude from the circumstances surrounding the Wilsons' purchase of their property that Lisa Gibson colluded with the PK Defendants in misrepresenting the fair market value.[46]

     In short, given the investigations conducted by the Commonwealth of Pennsylvania, the testimony of Ms. Kleintop, and the appraisals from 2000 and 2001, there is sufficient competent evidence to create a genuine issue of material fact as to whether Lisa Marie Gibson and the PK Defendants conspired to defraud the Wilsons.  Accordingly, Lisa Gibson is not entitled to

---

[45]Counsel for Lisa Gibson initially filed a summary judgment motion as to the Wilsons' claims on April 23, 2007, (Dkt. Entry 242), but did not submit a supporting brief.  This first motion will be dismissed.

[46]Lisa Gibson contends that Plaintiffs lack evidence that the appraisals performed by her did not conform with the applicable standard of care.  (Def. Lisa Gibson's Mot. Summ. J., Dkt Entry 279, ¶ 2).  To the contrary, in her Consent Agreement, she conceded numerous deficiencies in her appraisal of the Wilsons' property.  Therefore, this argument has no merit.

summary judgment on the Wilsons' RICO conspiracy claim.

### 3.  Lender Defendants Ocwen and Firstar

Defendants Ocwen and Firstar argue that the Wilsons have not produced sufficient

evidence to support an inference that they conspired with others in a scheme to defraud.

Specifically, Ocwen and Firstar claim there is no evidence of an agreement to pursue a criminal

objective or of them knowingly agreeing to facilitate a scheme to defraud.  (Defs. Ocwen &

Firstars' Mem. Supp. Mot. Summ. J, Dkt. Entry 234, at 8.)

"Rule 56(e) does not allow a party resisting a motion to rely merely upon bare

assertions, conclusory allegations of suspicions." Fireman's Insurance Co. of Newark, NJ, v.

DuFrense, 676 F.2d 965, 969 (3d Cir. 1982).  In this case, the Wilsons exclusively rely upon

unsubstantiated suppositions and speculation.  It is undisputed that neither Firstar nor Ocwen

was involved in the sales transaction.  The Wilsons' mortgage was transferred to Firstar as

trustee, and Firstar served no other role in this transaction.  (Firstar/Ocwen Statement of

Material Facts, Dkt Entry 233, ¶¶ 4-5.)[47]  Ocwen started servicing the loan in 2001, two years

after the loan's origination.  (Id. at ¶ 6.)  In their RICO statement, the Wilsons assert that Firstar

---

[47]Plaintiffs have not responded to the Firstar/Ocwen Statement of Material Facts, and
are thus deemed to have admitted each of the statements.  See Local Rule of Court 56.1.
Plaintiffs' submission of a separate statement of material facts (Dkt. Entry 245), as opposed to
responding with admissions or denials to the moving party's Local Rule 56.1 statement, is not
sufficient to comply with Local Rule of Court 56.1.  Williams Controls, Inc. V. Parente,
Randolph, Orlando, Carey & Associates, 39 F. Supp. 2d 517, 519 n.1 (M.D. Pa. 1999).

and Ocwen became members of the conspiracy in 2001, two years after the Wilsons purchased

their property (Dkt. Entry 205, ¶¶ T & U), but the Wilsons never explain how serving as trustee

or servicing agent on a mortgage furthered the conspiracy or why it would have benefitted

Firstar and Ocwen to have engaged in the conspiracy.  The Wilsons even concede that they

cannot point to any facts suggesting an agreement or conspiracy on the part of Ocwen and

Firstar with the other Defendants.[48]  (Wilsons' Mem. Opp'n Defs. Ocwen & Firstars' Mot.

Summ. J., Dkt. Entry 244, at 11.)  There is simply no competent evidence that Firstar or Ocwen

knowingly participated in a scheme to defraud the Wilsons.

Defendants Ocwen and Firstar find themselves in a situation similar to that of First

Eastern Bank in Dongelewicz.  In Dongelewicz, First Eastern Bank served as the primary

source of financing for CBG, a development company that failed to turn a profit and filed for

bankruptcy.  104 F. App'x at 814.  Individual purchasers then brought suit against CBG under

RICO alleging it committed fraud.  The purchasers named First Eastern a co-conspirator.  The

purchasers claimed that First Eastern Bank knowingly provided funds to the insolvent

developer, thereby siphoning millions of dollars of the bankruptcy estate's receivables.  Id.  Our

Court of Appeals found that First Eastern Bank "was merely a lender – it supplied financing for

a development that failed, and then took steps to preserve its collateral." Id. at 818.  The court

---

[48]Plaintiffs state "they were not on the inside of Defendants' operations and do not have
the day-to-day working knowledge of the agreements between the Defendants."  (Wilsons'
Mem. Opp'n Defs.' Ocwen & Firstars' Mot. Summ. J., Dkt. Entry 244, at 11.)

reasoned that "the fact that First Eastern provided financing to CBG in no way gives rise to an inference (i) that First Eastern agreed to commit predicate acts; or (ii) that First Eastern knew that the predicate acts were part of racketeering activity, two necessary elements of a RICO conspiracy." Id.

Firstar and Ocwen are even further removed from the underlying fraudulent transaction than First Eastern was in Dongelewicz. That Firstar acquired the New Century mortgage and Ocwen became a servicing agent of the loan two years after it was made provides no rational basis for inferring knowing participation in the alleged underlying scheme to defraud.

The Wilsons' contention that Ocwen and Firstar breached their duty to the Wilsons is likewise untenable. The Wilsons argue that Ocwen and Firstar failed to exercise due diligence when they entered into the agreements to purchase and service the Wilsons' mortgage. (Wilsons' Mem. Opp'n Defs. Ocwen & Firstars' Mot. Summ. J., at 9.) There was, however, no duty running from Firstar or Ocwen to the Wilsons. Under Pennsylvania Law, "there is no duty on the part of a lender to inspect the mortgaged property to determine that the borrower is obtaining that which he may have been promised by the vendor or that which he believes he is obtaining." Federal Land Bank of Baltimore v. Fetner, 410 A.2d 344, 348 (Pa. Super. Ct. 1979).

In summary, there are no genuine issues of material fact with respect to the Wilsons' RICO conspiracy claim against Ocwen and Firstar. Accordingly, their motion for summary judgment will be granted. See October 4, 2007 Memorandum and Order in Jeppson v. Parisi et

al., No. 3:CV-05-0564, Dkt. Entry 97, at 30-31 (granting summary judgment in favor of lender involved in financing a home acquisition due to the absence of evidence of knowing participation in an alleged scheme to defraud).

### E.  Marco and Maria Yagual's RICO Claims

#### 1.  The PK Defendants

The PK Defendants argue that the Yaguals cannot prove the allegations in their Complaint.  (PK Defs.' Mem. Supp. Mot. Summ. J. Re:  Yaguals, Dkt. Entry 223, at 8.)  In particular, the PK Defendants contend that the Yaguals cannot establish that the appraisal of their home was inflated, (id. at 9), that a scheme to defraud existed, or that they were damaged by a predicate act of mail fraud.  (Id. at 9-10.)

 To support their claim that their property was overvalued, the Yaguals point to valuations of their property performed after they acquired it.  The Yaguals first point to the Monroe County Assessor's Office valuation of their property at $129,948 in 2002.  Although this valuation greatly differs from the Yaguals' original appraisal, which valued their property at $206,000, it cannot be considered because it is not competent evidence.  As noted above, the Monroe County Assessor valued property in 1989 dollars.  It simply cannot be said that a property value of $130,000 in 1989 would not equate to a much higher value in 2002 dollars. No competent evidence has been presented to show that adjustment of the value in 1989 dollars to 2002 dollars would show an inflated appraisal at the time of the Yaguals' acquisition.

48

Although the Yaguals claim that other appraisals were conducted, they have not produced them.  The Yaguals' testimony as to the values expressed in the appraisals is, of course, hearsay.  In sum, without competent evidence of an inflated appraisal, the Yaguals' claims cannot survive the PK Defendants' motion for summary judgment.[49]

### 2.  The IMC Defendants

The IMC Defendants are entitled to summary judgment because the Yaguals have not presented competent evidence that they were defrauded by an inflated appraisal.  In addition, as in the case of the lender in Dongelewicz, there are no facts in this case that would support a reasonable inference that the IMC Defendants knew they were supporting a pattern of racketeering activity.  Specifically, there is a lack of evidence that the IMC Defendants knowingly agreed to or participated in a conspiracy to defraud.  The fatal deficiency in this claim, as in others discussed above, is a lack of competent evidence that a scheme to defraud actually existed.  The Yaguals have failed to present evidence to substantiate their allegations against the IMC Defendants.  The record simply demonstrates that the IMC Defendents furnished the financing so that the Yaguals could purchase their property.  Beyond this, there is no evidence of knowingly agreeing to facilitate a scheme to defraud.  Thus, the IMC Defendants are entitled to summary judgment on this basis as well.

---

[49]As noted above, the Yaguals have not sued NEPA Appraisal Services in connection with the appraisal that was commissioned to secure financing.

**F. Charmaine Cooper**

### 1. The PK Defendants

Like the claims of her co-Plaintiffs, Ms. Cooper's claim is centered on an alleged inflated appraisal.  Ms. Cooper first submits as evidence of the inflated appraisal her testimony as to the Monroe County Assessor's Office valuation of the property at $137,214 on an unspecified date.  Ms. Cooper has failed to submit any documentation associated with this valuation.  Her testimony about the matter is hearsay and is not sufficient to withstand summary judgment.  Morever, as noted above, even if this valuation was presented as competent evidence, the Assessor's valuation in 1989 dollars does not show that the original appraisal of Ms. Cooper's property was inflated fraudulently.

Next, in an attempt to undermine the original appraisal of her property ($197,500 as of March 3, 1999), Ms. Cooper refers to an appraisal by Mr. Roth of Roth Appraisal Service, which valued Ms. Cooper's property at $140,000 as of April 12, 2002.  (PK Defs.' App. Supp. Mot. Summ. J. Re:  Cooper, Dkt. Entry 281-5, at 187a-211a).  Because of the "large discrepancy in the appraisal performed by Defendant Centrella and that of Roth Appraisal Services," Ms. Cooper asserts that there is a genuine issue of material fact as to the correct market value of the property.  (Pl. Cooper's Opp'n PK Def.s' Mot. Summ. J., Dkt. Entry 284, at 9.)

There are several reasons why the Roth appraisal does not suffice to create a genuine dispute as to the validity of the Centrella appraisal.  First, Mr. Roth has passed away, and Ms.

Cooper has not offered any evidence to corroborate the reliability of his appraisal. Valuation is a matter of expert opinion, and Mr. Roth's appraisal cannot be admitted into evidence without foundational evidence attesting to his qualifications and the reliability of the methodology he employed. Second, Mr. Roth does not find any fault with the Centrella appraisal. Thus, unlike the Lisa Gibson appraisal of the Wilson property, there is no independent basis for finding that the Centrella appraisal was inflated. While there are two disparate valuations, that fact does not support an inference of fraud. In this regard, it is interesting to note that Ms. Cooper acknowledged the existence of a third appraisal, conducted in 2003, that valued her home at $251,000, nearly 50% greater than the Roth appraisal. Finally, there is no dispute that Centrella was retained by Bankers First, which had no affiliation with the PK Defendants.

Ms. Cooper contends, however, citing Dongelewicz, that the PK Defendants actions give rise to an inference that (1) the PK Defendants agreed to commit predicate acts and "directed their employees to commit unlawful acts in order to make a lot of money;" or (2) the PK Defendants knew they were participating in racketeering activity through mail or wire fraud.[50] (Pl. Cooper's Opp'n PK Def.s' Mot. Summ. J., Dkt. Entry 284, at 8.) In order to give rise to an inference of fraud, there must be evidence of fraud or a scheme to defraud. Here, there is a

_____

[50]In her brief in opposition, Ms. Cooper argues that Nations First failed to exercise due diligence in verifying the accuracy of the appraisals and the credentials of Defendant Jenny Centrella. (Pl. Cooper's Opp'n PK Defs.' Mot. Summ. J., Dkt Entry 284, at 8.) Nations First, however, did not broker Ms. Cooper's mortgage loan – Bankers First did. Bankers First has been dismissed from this action. (Order of April 24, 2006, Dkt. Entry 135.)

lack of evidence that Ms. Cooper was defrauded.[51]  Thus, due to a lack of competent evidence, the PK Defendants' Motion for Summary Judgment will be granted.

### ii.  Jenny Centrella and M&T (the Appraiser and Lender)

In addition to the absence of competent evidence of a fraudulent appraisal, Ms. Cooper has not presented any evidence that Centrella or M&T conspired with others to defraud her. Ms. Cooper contends that the testimony of Dana Kleintop is evidence of Ms. Centrella's and M&T's involvement in the conspiracy.  (Pl. Cooper's Mem. Opp'n Def. Centrella's Mot. Summ. J., at 8; Pl. Cooper's Mem. Opp'n Def. M&T's Mot. Summ. J., at 8.)  Ms. Kleintop's testimony certainly raises questions about the PK Defendants conduct generally, but fails to implicate Ms. Centrella or M&T in any fraudulent conduct.  The fraud spoken of by Ms. Kleintop is not imputable to Ms. Centrella and M&T simply because they took part in a transaction with the PK Defendants, especially since there is a lack of evidence that a fraud occurred.

Furthermore, M&T has presented uncontradicted evidence that it took all the appropriate steps to extend financing to Ms. Cooper.  The due diligence of M&T included review of the credit reports; verification of income and debts; confirmation that the appraisal used appropriate methodology, including relevant comparable sales; and adherence to governing underwriting

---

[51]The Pennsylvania Attorney General's Office's investigation into the PK Defendants' business practices and the testimony of Dana Kleintop do suggest fraud generally on the part of the PK Defendants, but do not specifically refer to the appraisal of Ms. Cooper's property or to Ms. Centrella's participation in appraising the property.

standards.  The undisputed record does not support any inference of predatory lending tactics in Ms. Cooper's case.

In sum, Ms. Cooper's allegation of a conspiracy to defraud against Ms. Centrella and M&T, without more, is simply insufficient to survive a motion of summary judgment. Accordingly, M&T and Ms. Centrella are entitled to summary judgment.

### G.  Marilyn and Almus Wilsons' UTPCPL Claims

#### 1. General UTPCPL Claim Against Lisa Gibson and the PK Defendants

The Wilsons generally aver that "Defendants' acts, misrepresentations, omissions of material facts, practices, and non-disclosures alleged [in the complaint] constituted unlawful, unfair, deceptive, and fraudulent business practices and acts within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law." (Compl. ¶ 435.)  For example, Plaintiffs aver that "Defendants made misleading and deceptive statements and omissions concerning the value and the financing of the houses being purchased by consumers with the intent that consumers rely on their statements concerning the value of the house and the financing therefor," in violation of 73 P.S. § 201-2(4)(ix).  (Compl. ¶ 444.)

"There is no question that the purchase or lease of a home, condominium, or apartment for *residential* purposes comes under the protections of the UTPCPL.  Growall v. Maietta, 931 A.2d 667, 676 (Pa. Super. Ct. 2007) (citing Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641, 648 (Pa. Super. Ct. 1990); see also Gabriel v. O'Hara,

534 A.2d 488, 491 (Pa. Super. Ct. 1987) ("[T]he sale of real estate falls within the purpose of the UTPCPL.").  The UTPCPL enumerates twenty (20) "unfair methods of competition" and "unfair or deceptive acts or practices," see 73 P.S. § 201-2(4)(i)-(xx), and contains a catchall provision that proscribes "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Id. § 201-2(4)(xxi). The UTPCPL provides a private right of action to consumers who purchase goods or services, including real estate, and suffer an ascertainable loss as a direct result of an unlawful act or practice. Id. § 201-9.2(a); see also Skurnowicz v. Lucci, 798 A2d 788, 794 (Pa. Super. Ct. 2002).

Of the twenty-one (21) total unfair or deceptive acts or practices, the Wilsons allege that the PK Defendants violated the following:

> (i) Passing off goods or services as those of another;
> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
> . . . .
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
> . . . .
> (xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
> . . . .
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

54

73 P.S. § 201-2(4)  Of those provisions, the most relevant is 73 P.S. § 201-2(4)(xxi), "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," which has been recognized as applying to residential real estate transactions.  See, e.g., In re Barker, 251 B.R. 250, 261-62 (Bankr. E.D. Pa. 2000).  In this regard, the PK Defendants allegedly made verbal representations as to the value of the property that differed from those contained in the Good Faith Estimates, used false home prices and interest rates to attract customers, failed to disclose their affiliations, never disclosed the increase in property taxes for constructing a home on a property, made false concessions, and discouraged the use of an attorney, all in violation of  73 P.S. § 201-2(4). (Compl. ¶¶ 437, 441, 442, 443, 447, 465, 477.)

In considering the Wilsons' claim, it is important to remember that "the general purpose of the UTPCPL is to protect the public from fraud and unfair deceptive business practices." Burke v. Yingling, 666 A.2d 288, 291 (Pa. Super. Ct. 1995.); see also Shulick v. DeGroat, No. 1565 Jan. Term 2005, 2005 WL 1384574, at *3 (Pa. Commn. Pl. 2005).  Moreover, the UTPCPL "is to be liberally construed in order to effectuate its purpose."  Keller v. Volkswagen of America, Inc., 733 A.2d 642, 646 (Pa. Super. Ct. 1999).  In this regard, courts have held that a showing of deceptive activity, as opposed to establishing the elements of a common law fraud

claim, is sufficient to impose liability.[52]  See Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002) ("Because the plaintiff here has alleged that the defendants' conduct was deceptive, there is no need for her to allege all of the elements of common law fraud."); In re Patterson, 263 B.R. 82, 92-93 (Bankr. E.D. Pa. 2001) (finding that to require common law fraud "would render the statute's addition of the word 'deceptive' redundant."); Commonwealth v. Percudani, 825 A.2d 743, 746-67 (Pa. Commw. Ct. 2003).  But see Skurnowicz, 798 A.2d at 794 (the UTPCPL catchall provision requires proof of common law fraud); Booze v. Allstate Ins. Co., 750 A.2d 877, 880 (Pa. Super. Ct. 2000) (same).

A deceptive act is "'the act of intentionally giving a false impression' or 'a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it.'" In re Patterson, 263 B.R. at 94 (quoting BLACK'S LAW DICTIONARY 413 (7th ed.1999)).  There is a genuine issue of material fact as to whether the PK Defendants knowingly falsely represented the value of the Wilsons' property by securing a fraudulent appraisal, thus requiring the Wilsons to pay more than the fair market value for their home.  Furthermore, it is reasonable to infer from the totality of the circumstances that the PK

---

[52]The common law elements of fraud "include a material misrepresentation of an existing fact, scienter, justifiable reliance on the misrepresentation, and damages." Booze v. Allstate Ins. Co., 750 A.2d 877, 880 (Pa. Super. Ct. 2000) (citing Hammer v. Nikol, 659 A.2d 617, 620 (Pa. Commw. Ct. 1995)).  Even though not required, the Wilsons have submitted sufficient evidence to satisfy these elements.

Defendants knowingly or intentionally defrauded the Wilsons, especially in light of the Attorney General's investigation, the testimony of the PK Defendants' former employee, the other appraisals conducted on the Wilsons' property, and Lisa Gibson's Consent Agreement as to the Wilsons' original appraisal.   Therefore, viewing the evidence in the light most favorable to the Wilsons, they have set forth sufficient evidence to survive the PK Defendants' Motion for Summary Judgment.[53]

The PK Defendants assert that the parol evidence rule bars a claim of fraud in the inducement to enter into an integrated contract, and thus the Wilsons could not have relied on any representations made before entering the contract.   (PK Defs.' Mem. Supp. Mot. Summ. J. Re:  Wilsons, Dkt. Entry 240, at 13.)  The Wilsons respond that their claim of fraud is not based on fraud in the inducement, but concerns the fraudulent appraisal.  (Wilsons' Br. Opp'n PK

———————————————

[53]Although the Wilsons' claim will survive summary adjudication, some of their accusations are unsubstantiated.  In their claim that the PK Defendants used a false concession, the Wilsons argue that the PK Defendants provided the concession up front, but then recovered it by selling the property at an inflated value.  The Wilsons, however, have failed to submit any evidence that they received a concession from the PK Defendants. The Wilsons alleged that the PK Defendants used false home prices and interest rates to attract more purchasers.  When asked about the interest rates, Marilyn Wilson said "I don't know what the conventional rate was."  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re:  Wilsons, Dkt. Entry 240, at 203a.)  Apart from this testimony, there is no evidence of false interest rates or that the PK Defendants used false home prices to attract purchasers.  Finally, the Wilsons argue that the Good Faith Estimates provided to them differed from the PK Defendants' representations of the property value.  There are three Good Faith Estimates signed by the Wilsons that represent the property value at $184,000.  (Id. at 118a, 124a, 139a.)  This is the price at which the property was sold, and there is no evidence that any other values were represented.

Defs.' Mot. Summ. J., Dkt. Entry 252, at 14.)

The PK Defendants rely on Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004), where the Court found that the plaintiff ticket purchasers could not have relied upon the prior representations excluded in their agreement's integration clause.  In Yocca, ticket purchasers received a brochure from the Pittsburgh Steelers offering them the opportunity to purchase stadium builder licenses (SBLs) for the newly constructed football stadium.  The brochure "explained that the new stadium would be both bigger and better than the existing stadium, Three Rivers Stadium, and would have more seats closer to the field."  Id. at 428.  The brochure further notified the ticket purchasers that, if they elected to buy SBLs, they would be mailed a contract notifying them of their seat assignment.  Id. at 429.   The ticket purchasers decided to purchase the SBLs, based on the brochure, and were later mailed contracts containing a detailed diagram of the location of the seats.  Id. at 431. Thereafter, to their surprise, the ticket purchasers discovered that their seats were actually in less desirable, less expensive sections than shown in the brochure.  Id.  When the ticket purchasers attempted to demonstrate that the representations in the brochure were part of the contract, the court determined the contract to be the parties' entire agreement and that the parol evidence rule precluded "any previous oral or written negotiations or agreements involving the same subject matter . . . to explain or vary the terms of the contract."  Id. at 436.  Therefore, the court found the signed-contract to be the parties' entire agreement and that, "by signing the SBL

Agreement, which contained an integration clause stating that the terms of the SBL Agreement superceded all of the parties' previous representations and agreements, [ticket purchasers] explicitly disclaimed reliance on any [ ] representations" in the brochure.  Id. at 438.

Yocca is factually distinguishable from this case.  The gist of this action is the alleged fraudulent appraisal.  Nothing in the sales agreement would relieve the PK Defendants of liability for rigging the entire transaction.  Nor are the Wilsons relying upon inconsistent antecedent statements.  Thus, Yocca has no application.

The PK Defendants assert that, because the Wilsons did not receive their appraisal until two or three years after they closed on their purchase, they could not have relied on it in purchasing their property.  (PK Defs.' Mem. Supp. Mot. Summ. J. Re:  Wilsons, at 14.)  This argument is misplaced.  The Supreme Court of Pennsylvania has held that "'reliance' can be presumed when a party makes material misrepresentations."  Zwiercan v. General Motors Corp., No. 3235 JUNETERM 1999, 2002 WL 31053838, at *4 (Pa. Commw. Ct. 2002) ("When actual reliance cannot be established, courts have looked to the nature of the parties' relationship and materiality of the statement to establish a presumption of reliance.") (citing New York Life Ins. Co. v. Brandwene, 172 A. 669, 671(Pa. 1934).

The Wilsons' case is similar to Drayton v. Pilgram's Pride Corp., No. Civ.A. 03-2334, 2004 WL 765123, at *7 (E.D. Pa. 2004), where the Court found that the plaintiff, an unsophisticated consumer who ate adulterated poultry products resulting in his death, relied on

the defendant manufacturers assurances of an uncontaminated product.   The Court reasoned

that a consumer must rely upon what the manufacturer discloses in order to make a purchasing

decision.  Id.  The Court further noted that "[a]lthough in normal UTPCPL false advertising

claims reliance is required . . . Defendants [in this case] allegedly knew their product was

adulterated and therefore dangerous, and would therefore have a duty to advise

unsophisticated consumers of that material fact or not advertise their products as being in

compliance with USDA and FDA regulations." Id.

The reasoning of Drayton is compelling in this case.  Here, although the Wilsons never

saw the appraisal, they relied on the PK Defendants and Lisa Gibson to furnish an appraisal

that complied with industry requirements and standards.[54]  Like the consumer in Drayton, the

Wilsons were not in a position to know of the existence of any defects.  And absent the

appraisal, the transaction would not have been consummated, at least not for $185,000.

As to Lisa Gibson's Motion for Summary Judgment, there is likewise sufficient evidence

that she engaged in deceptive activity in furnishing an appraisal for the Wilsons' property.  See

discussion supra pp. 43-44.  Therefore, her Motion for Summary Judgment will be denied.

### 2.  UTPCPL Claim based upon Violations of the Federal Truth in Lending Act and Regulation Z against Lisa Gibson and the PK Defendants

---

[54]The Wilsons did sign a Notice To Applicant Of Right To Receive Copy of Appraisal Report on June 30, 1999, (Dkt. Entry 240-3, at 199a), but apparently did not request to see a copy at that time.  Even so, this does not preclude them from relying on an inaccurate appraisal.

The Wilsons assert violations of 15 U.S.C. § 1664(d) and 12 C.F.R. § 226.24(c)(1).[55]

The Wilsons assert that alleged violations of these federal law provisions constitute per se

violations of the UTPCPL.  The PK Defendants respond that the Wilsons did not purchase the

home displayed in some advertisement, nor have they produced a copy of the advertisements

they read.  (PK Defs.' Mem. Supp. Mot. Summ. J. Re:  Wilsons, at 16-17.)

Although the Wilsons have submitted copies of several advertisements, (Pls.' App. A,

---

[55] Section 1664(d) of Title 15 U.S.C. provides:

Requisite disclosures in advertisement

If any advertisement to which this section applies states the
amount of the down payment, if any, the amount of any installment
payment, the dollar amount of any finance charge, or the number
of installments of the period of repayment, then the advertisement
shall state all of the following items: (1) The down payment, if any.
(2) The terms of repayment. (3) The rate of the finance charge
expressed as annual percentage rate.

Section 226.24 of 12 C.F.R.., known as Regulation Z, provides:

If any of the following terms is set forth in an advertisement, the
advertisement shall meet the requirements of paragraph (c)(2) of
this section: (i) The amount or percentage of any down payment.
(ii) The number of payments or period of repayment.  (iii) The
amount of any payment.  (iv) The amount of any finance charge.

Paragraph (c)(2) of Regulation Z provides that an advertisement stating any of the terms set
forth in paragraph (c)(1) must include the following: (i) the amount or percentage of the down
payment; (ii) the terms of repayment; (iii) the annual percentage rate, using that term, and, if
the rate may be increased after consummation, that fact.

Dkt. Entry 247, at 16-19),  there is no evidence that these are the advertisements that the

Wilsons read.  Furthermore, the Wilsons have not identified how these advertisements violate

Regulation Z and the Truth and Lending Act, which in turn violate the UTPCPL.[56]  Thus, the

Wilsons have failed to demonstrate a violation of these provisions.  See Strang v. Wells Fargo

Bank, NA., No. 04-CV-2865, 2005 WL 1655886, at *8 (E.D. Pa. July 13, 2005).  Accordingly,

the PK Defendants' Motion for Summary Judgment on this claim will be granted.

In regard to Lisa Gibson, there is no competent evidence that she engaged in

advertising activities.  Thus, her Motion for Summary Judgment on this claim will likewise be

granted.

### 3.  UTPCPL Claim based upon an Alleged Bait and Switch Unfair Trade Practice against the PK Defendants

As noted by the PK Defendants, the Wilsons did not testify that the PK Defendants

"advertised goods or services with intent not to sell them as advertised," as required by 73 Pa.

Stat. Ann. § 201-2(4)(ix).  Furthermore, there is a lack of evidence that the Wilsons were lured

to the Poconos by low prices and then convinced to purchase higher priced goods.[57]  Thus, the

---

[56]In their complaint, the Wilsons generally aver "[t]he advertisement fails to disclose the terms of repayment (e.g., 30 years) and the annual governing rate (e.g., 7.5%) as required by the Truth in Lending Act . . ." and Regulation Z.  (Compl. ¶ 490.)  In their brief in opposition, however, the Wilsons do not point to a specific advertisement.

[57]Marilyn Wilson did not recall any extensive sales pressure on the part of the PK Defendants.  (Marilyn Wilson Dep., Dkt. Entry 240-5, at 204a.)  Moreover, she did not remember what the advertisements said, other than that the prices were cheaper than in New York.  (Id. at 199a.)

Wilsons' claim of Bait and Switch under the UTPCPL will be dismissed.

### 4. UTPCPL Claim for taking sums of money and failing to disclose a second Mortgage against the PK Defendants

The Wilsons allege that the PK Defendants violated the UTPCPL for failing to disclose the second Mortgage on the Wilsons' property and for taking sums of money at the time of the closing for a second mortgage.  (Compl. ¶¶ 534, 535.)  The PK Defendants contend there is insufficient evidence to sustain this claim.  (PK Defs.' Reply Br. Re:  Wilsons, Dkt. Entry 261, at 1-2.)  As stated in the facts, when the financing came up short, the PK Defendants lent the Wilsons an additional $9,200 to cover the remaining costs.  The Wilsons then signed a Note in favor of the PK Defendants on August 4, 1999, agreeing to repay the PK Defendants $93.38 per month.  (PK Defs.' App. Mem. Supp. Mot. Summ J. Re: Wilsons., Dkt. Entry 240-4, at 142a-143a.)  The Wilsons have not attempted to undermine the validity of this document.  Furthermore, there is no testimony or evidence that the PK Defendants took sums of money at the Wilsons' closing.  Thus, these allegations are insufficient to support the Wilsons' claim, and the PK Defendants Motion for Summary Judgment will be granted as to this claim.

### H.  The UTPCPL Claims of the Remaining Plaintiffs

The plain language of 73 P.S. § 201-9.2(a) requires a plaintiff to "suffer an *ascertainable loss* as a direct result of an unlawful act or practice." 73 P.S. § 201-9.2(a) (emphasis added).  The Supreme Court of Pennsylvania observed that  "to bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or

representation and that he *suffered harm* as a result of that reliance." Yocca, 854 A.2d at 438 (emphasis added).  Other courts have also recognized this legal requirement under the UTPCPL.  See Weinberg v. Sun Co., Inc., 565 Pa. 612, 618 (2001) ("[The UTPCPL] clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action."); Brunwasser v. Trans World Airlines, Inc., 541 F. Supp. 1338, 1347 (W.D. Pa. 1982) (noting that the ascertainable loss requirement of the UTPCPL is to insure that individuals bringing suit have in fact been damaged by a deceptive trade practice).

Other than the Wilsons, Plaintiffs have failed to present evidence of an inflated appraisal, causing them to pay more than fair market value for their homes.[58]  Without evidence of an inflated appraisal, there is simply no ascertainable loss.  As a result, all Defendants' motions for summary judgment will be granted with respect to the UTPCPL claims of Plaintiffs Natalie Wilson, Rayon McLean, Maria Yagual, Marco Yagaul and Charmaine Cooper.

## IV.  CONCLUSION

For the reasons set forth in the foregoing Memorandum, all Defendants' Motions for Summary Judgment with respect to all claims of Natalie Wilson, Rayon McLean, Maria and

---

[58]Some Plaintiffs allege that they were not told about the taxes on their home.  They allege that the PK Defendants knew or should have known that the property tax reassessments would be significant and could adversely affect the Plaintiffs' ability to meet their financial obligations.  (Compl. ¶ 477.)  Plaintiffs did sign, however, Good Faith Estimates, estimating the tax payments and cautioning that "[t]he fees listed are estimates – actual charges may be more or less."

Marco Yagual, and Charmaine Cooper will be granted. As to Almus and Marilyn Wilson, the

Lender Defendants' Motions for Summary Judgment will be granted with respect to the RICO

civil conspiracy claims remaining against them.   The PK Defendants and Lisa Gibsons' Motions

for Summary Judgment will be granted in part with respect to the UTPCPL claims of Almus and

Marilyn Wilson, but otherwise denied.   An appropriate Order follows.


**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALMUS WILSON, MARILYN WILSON,** | : |
| **CHARMAINE COOPER, MARCO YAGUAL,** | : |
| **MARIA YAGUAL, NATALIE WILSON, and** | : |
| **RAYON MCLEAN** | : |
| **Plaintiffs** | : |
| **v.** | :   **3:CV-04-1737** |
| | :   **(JUDGE VANASKIE)** |
| **STEVE PARISI, et al.,** | : |
| **Defendants** | : |

## ORDER

NOW, THIS 26th DAY OF FEBRUARY, 2008, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1.  The PK Defendants' Motion for Summary Judgment as to Natalie Wilson and Rayon McLeans' claims (Dkt. Entry 180) is **GRANTED**.

2.  The IMC Defendants' Motion for Summary Judgment as to Marco and Maria Yaguals' RICO conspiracy claim (Dkt. Entry 216) is **GRANTED**.

3.  The PK Defendants' Motion for Summary Judgment as to Marco and Maria Yaguals' claims (Dkt. Entry 222) is **GRANTED**.

4.  Defendants Ocwen and Firstars' Motion for Summary Judgment as to Almus and Marilyn Wilsons' RICO conspiracy claim (Dkt. Entry 232) is **GRANTED**.

5.  The PK Defendants' Motion for Summary Judgment as to Almus and Marilyn Wilson (Dkt. Entry 239) is **DENIED** as to the RICO claim and general UTPCPL claim, and is

**GRANTED** as to the UTPCPL claim based upon violations of the Federal Truth in Lending Act and Regulation Z, the UTPCPL claim based upon an Alleged Bait and Switch Unfair Trade Practice, and the UTPCPL claim for taking sums of money and failing to disclose a second Mortgage.

6.   Defendant Jenny Centrella's Motion for Summary Judgment as to Charmaine Cooper's claims (Dkt. Entry 258) is **GRANTED**.

7.   Defendant M&T's Motion for Summary Judgment as to Charmaine Cooper's RICO conspiracy claim (Dkt. Entry 265) is **GRANTED**.

8.   The PK Defendants' Motion for Summary Judgment as to Charmaine Cooper's claims (Dkt. Entry 277) is **GRANTED**.

9.   Defendant Lisa Gibson's Motion for Summary Judgment as to Natalie Wilson and Rayon McLeans' claims (Dkt. Entry 279) is **GRANTED**.  Lisa Gibson's Motion for Summary Judgment as to Almus and Marilyn Wilson (Dkt. Entry 279) is **DENIED** as to the RICO conspiracy claim and general UTPCPL claim, and is **GRANTED** as to the UTPCPL claim based upon violations of the Federal Truth in Lending Act and Regulation Z, the UTPCPL claim based upon an Alleged Bait and Switch Unfair Trade Practice, and the UTPCPL claim for taking sums of money and failing to disclose a second Mortgage.

10.   Defendant IndyMac's Motion for Summary Judgment on its Counterclaim against Natalie Wilson (Dkt. Entry 287) is **GRANTED**.  The Clerk of Court is directed to enter judgment

against Ms. Wilson and in favor of IndyMac in the requested amount of $303,663.13.

11.  The PK Defendants' Amended Motion for Leave to File Supplemental Motion for Summary Judgment to raise the issue of Natalie Wilson's standing (Dkt. Entry 229) is **DISMISSED**.

12.  Defendant Lisa Gibson's First Motion for Summary Judgment (Dkt. Entry 242) is **DISMISSED**.

13.  The Motion of Indymac for Entry of Summary Judgment Due to Lack of Opposition (Dkt. Entry 292) is **DENIED**.

14.  The Motion of M&T Bank for Entry of Summary Judgment Due to Lack of Opposition (Dkt. Entry 294) is **DENIED**.

15.  A telephonic status conference will be conducted on **Thursday, March 20, 2008, at 10:00 a.m.**  Plaintiff's counsel is responsible for placing the call to (570) 207-5720, and all parties should be ready to proceed before the undersigned is contacted.


**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

3